[Civ. No. 11250.   First Appellate District, Division Two.—March 6, 1941.]

EILEEN GALLO et al., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

340

Louis Oneal, Arthur G. Shoup and Duncan Oneal for Appellants.

Francis N. Foley and Robert Beale for Respondents.

SPENCE, J.—Plaintiffs are the widow and parents of Joseph J. Gallo deceased. They brought this action seeking

damages for the death of said deceased, which death was alleged to have been caused by the negligence of the defendants. Upon a trial by a jury, plaintiffs recovered judgment in the sum of $10,000. Defendants appeal from said judgment.

The death of said deceased occurred on the morning of December 10, 1937, when the automobile which he was driving was struck by a Southern Pacific train at the main Grand Avenue crossing just south of the Southern Pacific station at South San Francisco. Deceased was driving his car in a general westerly direction and was struck by a northbound passenger train. At said main crossing, there are seven tracks running in a northerly and southerly direction. A single street car track runs along Grand Avenue and crosses said seven tracks. Grand Avenue does not cross the tracks at right angles but runs slightly south of west in the direction in which the deceased was proceeding. Grand Avenue is over 80 feet in width where it crosses said tracks and the street car track is located to the south of the center thereof.

This crossing is heavily travelled and is what is commonly known as a guarded crossing. It is equipped with gates, bells and lights to give warning of the approach of trains. A gateman's tower is located on the west side of the crossing and to the south thereof. There are two gate standards and two gates on the west side of the crossing, one being located at the north side and the other being located at the south side of Grand Avenue. There is but one gate standard and one gate on the east side of the crossing and it is located at the north side of Grand Avenue. Near each gate standard is located a signal bell and a signal light to further warn persons of the approach of trains. There are also lights on the gates which operate when the gates are lowered. All of these warning devices are operated from the gateman's tower. The gates are operated by compressed air supplied by a hand pump. The signal bells and signal lights are electrically operated by means of switches. Apparently the defendant railroad kept a gateman in attendance at this crossing at all hours but, in any event, it is clear that for a long period of time before the accident, the defendant railroad kept a gateman in attendance throughout the morning hours. The time when the accident occurred was about 7:50 A. M. It is conceded by defendants that at the time of the

accident no gate was lowered, no signal bell was rung and no signal light was lighted.

Some further description of the crossing is required before proceeding to a discussion of the questions presented on this appeal. The two main line tracks are approximately in the center, there being two tracks to the west and three tracks to the east of said main line tracks. The northbound train was proceeding on the track which was the fourth track from the east side which was the side from which the deceased approached. It is conceded by all that there were numerous freight cars located on the first and second tracks crossed by the deceased. There is some conflict as to the number and exact location of said freight cars but there was ample evidence to show that there were long strings of cars on said tracks and that the northerly ends of said strings were in very close proximity to the southerly side of Grand Avenue. The defendant engineer testified that these freight cars obstructed his view to the right and it seems clear that said freight cars likewise obstructed the view of the deceased to the left as he started to make the crossing.

At the time of the accident there was a very heavy wind and rain storm. On previous occasions, the gateman had found that it was impossible to lower all or at least some of the gates when there was a heavy wind. When the gateman who was on duty at the time of the accident went to work at 7 A. M. he was advised by the gateman who was being relieved that the latter had been able to operate the gates only part of the time. The gateman on duty then attempted to operate the gates and found that he could not lower the gate on the east side or the north gate on the west side. In other words the south gate on the west side was the only gate which he was able to lower. He made no report to anyone regarding his inability to operate said gates.

During this heavy storm and shortly before the accident the deceased had driven across the tracks to the east side for the purpose of taking his wife to her place of employment. He was returning from the east side at about 7:50 A. M. and driving in a westerly direction for the purpose of going to his place of employment when the accident occurred. He had made such trips in the morning and evening for many months prior to the accident and was familiar with the crossing and the warning devices used. A truck was driven in a westerly direction across the crossing about half

a block ahead of deceased and a street car was being operated in a westerly direction to the rear of the deceased as he approached the crossing. The testimony shows that deceased approached the crossing in this storm at a speed of from 15 to 18 miles per hour and that he slowed down to about 10 miles per hour as he came to the tracks. As above stated, there were no warning devices in operation at the time. As deceased drove onto the tracks his car was struck by the northbound train, which was travelling at a speed of about 40 miles per hour, and he died almost instantly.

With respect to the actions of the gateman, the testimony showed that he was in the second story of the gateman's tower, reached by a stairway on the outside, when he first noticed the approach of the train. He made no attempt to lower the gates, or any of them, and he did not turn the switches to put the signal bells and signal lights in operation. He did leave the tower to go on the ground carrying with him a stop sign and a flag. With respect to the warning bells and lights he was asked, ''You walked right out of that tower without even taking the precaution of reaching up there and turning those on?'' and he answered, ''Yes, sir.'' There is a slight conflict in the testimony as to just when the gateman reached the ground and as to just what he did upon reaching the ground. We believe however that the evidence clearly indicates that he reached the ground very shortly before the accident; that he took a position near the west side of the crossing and at a point to the south of the street car track; and that he faced west toward the heavy east bound traffic and directed his attention thereto. It further appears that he held his stop-sign in front of his face toward the southwest in order to protect his face from the storm and that he held his flag motionless down at his side. As one witness described it ''he was making no move'' and ''he stood like a statue''. If we assume that the gateman arrived on the ground soon enough to give timely warning to the east-bound traffic by means of his stop-sign and flag and that he would have been visible on a clear day to west-bound traffic although he was at the opposite side of this wide crossing, it does not appear, when the circumstances are considered such as the weather, the vehicles and pedestrians on and near the crossing, the position taken by the gateman on the south side of the road and his failure to put his flag or his stop-sign in motion, that his actions

would have been such to give any effective warning to westbound traffic, more particularly in the light of the fact that all traffic at said crossing was accustomed to relying upon the gates and other mechanically operated warning devices.

■  Defendants contend that the deceased was guilty of contributory negligence as a matter of law but we find no merit in this contention. The above summary of the evidence appears sufficient to demonstrate that the question of whether the deceased was guilty of contributory negligence was a question of fact for the jury's determination. (*Crawford* v. *Southern Pac. Co.*, 3 Cal. (2d) 427 [45 Pac. (2d) 183]; *Robbins* v. *Southern Pac. Co.*, 102 Cal. App. 744 [283 Pac. 850].)

Defendants made no claim that the evidence was insufficient to show negligence on the part of said defendants and it is apparent that there was ample evidence to show negligence in many particulars. They do contend, however, that the trial court committed prejudicial error in the giving of certain instructions relating to the issues of negligence and contributory negligence.

■  Defendants first attack an instruction in which the trial court read to the jury the provisions of section 486 of the Civil Code relating to the requirement for the ringing of a bell or sounding of a whistle by a locomotive. It is claimed that the giving of such instruction without proper qualification embracing the issues of proximate cause and contributory negligence was error. (*Smellie* v. *Southern Pac. Co.*, 128 Cal. App. 567 [18 Pac. (2d) 97, 19 Pac. (2d) 982].) We may assume, without deciding, that the giving of said instruction in the form in which it was given was error despite the fact that the issues of proximate cause and contributory. negligence were thoroughly covered by other instructions. There remains, however, the question of whether the assumed error in giving said instruction was prejudicial. (*Lawrence* v. *Southern Pac. Co.*, 189 Cal. 434 [208 Pac. 966].) A review of the record discloses that little, if any, stress was laid upon the question of whether defendants' locomotive did or did not ring a bell or sound a whistle on approaching the crossing. In their brief defendants state that the plaintiffs' opening statement to the jury was "a fair statement of plaintiffs' theory of the case and a fair statement of the facts of the case." Said statement outlined in detail plaintiffs' claims of negligence but no mention

was made therein of any claimed failure of the locomotive to ring a bell or sound a whistle. Again in defendants' brief defendants state that defendants' negligence "was predicated principally, if not entirely upon the failure of the crossing gates to be lowered". Upon the trial, there were witnesses on both sides whose testimony was to the effect that there was no failure of the defendants to comply with said section 486. A reading of the record including the evidence and all of the instructions given leads us to the conclusion that the error, if any, in the giving of said instruction was not prejudicial to the defendants under the circumstances.

■ Defendants further contend that it was error to give an instruction regarding the necessity for operating a train "at a speed which is reasonable in view of all the circumstances" because of the claimed absence of any evidence which would warrant a finding of a negligent speed. We find no merit in this contention. There was the evidence of the witness Strong to show that the train was proceeding over a heavily travelled crossing within the city limits during a severe storm at a speed of "at least 40 miles per hour". Such evidence was sufficient to warrant the giving of said instruction and to support a finding of negligence.

Defendants further contend that the trial court committed error in the giving of several instructions relating to the rights and duties of the deceased in approaching and traversing the guarded crossing. It would serve no useful purpose to set forth all of said instructions. A reading of the entire charge to the jury convinces us that the jury was fully and fairly instructed and that there was no prejudicial error. We believe that all of the challenged instructions relating to the rights and duties of the deceased find support in the rules laid down in *Crawford* v. *Southern Pac. Co., supra,* and *Robbins* v. *Southern Pac. Co., supra,* and that the only justifiable criticism which might be directed at the charge as a whole is that some of the instructions, given at the request of defendants, were more favorable to the defendants than they were entitled to have them.

■ Defendants further contend that "the presumption that the decedent used due care cannot be indulged in this case". Under this heading, defendants claim it was error to instruct the jury that "you are not bound to decide in conformity to the declarations of any number of witnesses, which do not produce conviction in your minds, against a

less number or against a presumption or other evidence satisfying your minds''. (See Code Civ. Proc., sec. 2061, par. 2.) We find no error in the giving of said instruction. At the request of defendants, the trial court instructed the jury as follows: ''You are instructed that the law presumes that when the decedent started across the railroad track, he exercised ordinary care for his own safety and such presumption is evidence in this case.'' This statement was followed by a statement that if the jury found that such presumption was contradicted by the testimony of plaintiffs or of plaintiffs' witnesses or that the circumstances of the case could not be reconciled with such presumption, then such presumption was dispelled. As defendants requested these last mentioned instructions, they must have been of the opinion at that time that the question of whether the presumption was thus dispelled was a question of fact for the jury to determine from the evidence. As above indicated, we cannot say as a matter of law that said presumption was dispelled, and it was therefore proper to give the challenged instruction.

█ Defendants further contend that the trial court erred in denying their motion for a nonsuit and particularly as against plaintiffs James Gallo and Margaret Gallo, the parents of the deceased. From what has already been said, it is clear that defendants were not entitled to have their motion granted generally. As to the parents of the deceased, the motion was based particularly upon the ground that there was no evidence to show that the parents ''were in any way dependent on the decedent, or were damaged to any extent by his death.'' In our opinion, said motion was properly denied as to said parents as well as to the widow. While there was no evidence to show that the decedent had been actually giving his parents monetary assistance such evidence was not essential. It is true that damages in death cases are limited to the ''pecuniary loss'' to the surviving heirs but such loss includes the ''loss of the comfort, protection and society of the deceased.'' (*Duclos* v. *Tashjian,* 32 Cal. App. (2d) 444, 453 [90 Pac. (2d) 140].)

█ Defendants further contend that the trial court committed prejudicial error in sustaining an objection to the following question asked on cross-examination of the widow: ''Mrs. Gallo, have you any plan of contemplating remarriage in the near future?'' We believe this contention to be likewise without merit. Defendants have not called to our at-

tention any authority in this jurisdiction supporting their position and we know of none. The great weight of authority appears to support the trial court's ruling. (17 C. J. 1343, sec. 226 and cases cited.)

Defendants finally contend that the trial court erred in denying their motion for a new trial. No new points are raised in support of this contention and it follows from what has been said that said motion was properly denied.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 1, 1941.