[Civ. No. 23735. First Dist., Div. Four. June 3, 1968.]

CARLTON MANETTE CHERRIGAN III, a Minor, etc., et al., Plaintiffs and Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

Thomas M. O'Connor, City Attorney, R. J. Reynolds and William J. Mallen, Deputy City Attorneys, for Defendants and Appellants.

Hoberg, Finger, Brown & Abramson and Ingemar E. Hoberg for Plaintiffs and Respondents.

RATTIGAN, J.—This appeal is from a judgment entered upon a jury verdict in respondents' favor in their wrongful

death action against appellant.[1] The principal question presented is whether the trial court properly disposed of issues raised at the trial by the facts (1) that respondent had remarried before the trial and (2) that she had been pregnant with the child before she married the decedent.

The decedent was killed on January 19, 1963, only 35 days after his marriage to respondent on December 15, 1962. The action was commenced on March 11, 1963, in the names of respondent and the child (who was then unborn) as plaintiffs. Respondent appeared under her given name and the decedent's surname, which she bore as his widow. The child was born on May 14, 1963, and thereafter appeared, as a co-plaintiff with respondent, under his own name. Appellant admitted liability in the pleadings, "conditioned upon proof" that the child was decedent's.

Answering appellant's interrogatories in 1965, respondent disclosed among other things (1) that she had remarried on June 30, 1964, and (2) that she had become pregnant with the child in August 1962, four months before she married the decedent. At a conference held in chambers immediately before the trial commenced in 1966, respondent's counsel asked the trial court to exclude evidence of either fact, and to prohibit any mention of either, at the trial. Appellant's counsel, rejoining in part, formally moved for an order that respondent be required to amend her complaint to show her appearing as a plaintiff under her remarried surname.[2] In a written declaration filed in support of the motion, appellant

---

[1] As hereinafter used, the term "respondent" refers to the respondent widow named above as Nancy Cherrigan (which, as will appear, is not her present name), and the term "child" refers to the minor respondent. The action arose from the death of respondent's husband (the child's father), to whom we refer herein as "the decedent." We refer to both appellants—the City and County of San Francisco and its employee Otis L. Daniels—in the singular as "appellant."

[2] Appellant had previously "requested" this amendment at the pretrial conference in 1965. The court did not rule on the request at the time, but directed in the pretrial conference order that the parties file briefs on the question before trial. Appellant's pretrial conference statement and the order referred to the fact that appellant had admitted liability "conditioned upon proof" that the child was the decedent's. The order included the child's "heirship" as an issue to be tried. After the pretrial conference and two months before the trial, appellant moved for summary judgment in the child's favor on the issue of "heirship." Summary judgment was granted and entered as moved, in effect ordering—but without reference to the child's age or date of birth—that the decedent was the child's father. The pretrial conference order was apparently not formally amended, but the summary judgment effectively eliminated the question of the child's "heirship" from the issues to be tried.

both alleged and offered to prove the fact of respondent's remarriage, its date, and other related facts.[3]

The trial court denied appellant's motion. Ruling on respondent's request, the court ordered that evidence of her remarriage would be inadmissible and directed the attorneys and the parties, under pain of a mistrial being ordered, "not to indicate directly or indirectly the remarriage or to refer to the widow by her [re]married name." The court expressly reserved its proscription as to such matters in question which might arise by way of impeachment. The trial judge also specified that prospective jurors could be asked on *voir dire* whether any of them knew respondent's husband, but made it clear that he was to be identified by his name only and not as her husband.

Respondent's counsel then requested that evidence of the date of the child's birth be excluded, because of possible prejudice to respondent from the obvious import that she had been premaritally pregnant. Counsel pointed out that the paternity of the child had been adjudicated without reference to the date of its birth (see fn. 2, *supra*), and that the only relevant life expectancy in the action was the father's, not the child's.

Appellant's counsel argued that evidence of premarital pregnancy was a relevant factor in assessing the predictable stability of the parents' subsequent marriage, and that such assessment—of whether the marriage would have "lasted," had the decedent lived—was in turn relevant on the issue of damages in a wrongful death action by a surviving spouse. The court ruled that the child's age could be shown as "two years," but that the date of its birth would not be permitted in evidence. Whether the "stability" of respondent's marriage to the decedent was "a proper question to be before the jury," was discussed briefly, but no definitive ruling on the point was requested and none was made at the time.

At the trial which followed, appellant's counsel meticulously complied with the trial court's ruling as to evidence of respondent's remarriage. On *voir dire,* the court and counsel

---

[3]Among the other facts were the name of respondent's present husband; that he was in military service and receiving an income of $400.80 per month; that he and his family were entitled to free medical and hospital care plus "commissary and exchange advantages and government housing privileges at cheaper rates than ordinary"; that he had "accepted" the child into his family and intended to adopt it as his own; and that a child (respondent's second child) had been born of her remarriage.

interrogated some prospective jurors as to whether they knew respondent's present husband or his parents (referring to all of them by name alone) and asked some general questions concerning his military organization and station, but respondent was not associated with the persons or places named; no evidence was offered concerning the fact of remarriage; and the remarriage, as such, was not mentioned and did not reach the jury.

Concerning her marital situation with the decedent, respondent testified as follows: They were married on December 15, 1962. She was then 19 years of age, the decedent was 20. They had met in June 1962. They were married in a Catholic church in Petaluma. Respondent was a member of the Catholic faith, the decedent was an Episcopalian. Both were then residents of Marin County. Despite minor arguments, their marriage was happy.

On cross-examination of respondent, the trial court sustained objections to appellant's questions directed to the date upon which respondent and the decedent had become engaged to marry, and to her acquaintance with his parents. The jury did learn of her premarital pregnancy, after respondent brought about the disclosure in her own testimony.[4] The premarital pregnancy was not otherwise mentioned in the evi-

---

[4] The disclosure occurred as indicated in this exchange:

"[By appellant's counsel] Q. How much of your marriage did you work at . . . [a named firm] . . .?

"[By respondent] A. Well, I planned on working until we started a family.

"Q. When was that?

"A. Well, it happened I found out I was pregnant after the accident.

". . .

"Q. Well, you knew about that before you had the accident, didn't you?

"[Respondent's counsel] I will object to the question as immaterial, irrelevant, and improper.

"THE COURT: Well, not this point, not this question. Now, I will overrule the objection, and she may answer the question.

"THE WITNESS: A. Yes, I did.

". . .

"[By appellant's counsel] Q. Well, when did you know about it?

"[Respondent's counsel] Objected to as incompetent, irrelevant and immaterial.

"[Appellant's counsel] Well, she opened it up.

"THE COURT: Overruled. She may answer.

"THE WITNESS: A. Before we were married.

"[Appellant's counsel] Q. Pardon me?

"A. Before we were married.

"[Appellant's counsel] That's all."

(The record shows that the witness was excused at this point, and that she was not recalled thereafter.)

dence, and appellant's counsel did not refer to it in his argument to the jury.

At another conference in chambers held upon the conclusion of respondent's testimony, her counsel requested an offer of proof as an indication of appellant's intent relative to the fact of her premarital pregnancy. Appellant's counsel stated that he would show through an expert witness "that there are certain factors known to research indicating instability in marriage, and . . . [the expert] . . . will tell what those factors are, and one of them will be premarital pregnancy." Respondent's counsel indicated his objection to such evidence. Stating that it would be admissible, the court in effect overruled the objection.

Upon resumption of the trial, the defense called and qualified Dr. Judson T. Landis, a professional sociologist, as an expert witness. Dr. Landis, answering a hypothetical question, testified that the facts in evidence concerning respondent's marriage to the decedent were "predictive" of its failure.[5] This opinion, according to the witness, was based upon his education, studies and experience with "what the factors are that are predictive of whether a marriage will last or whether it will not last." He testified that "factors that lead to instability in marriages" included youthful spouses, their short acquaintance and short engagement prior to marriage, the fact of the parties' premarital sexual relations or premarital pregnancy, disparity of religious faiths ("especally

---

[5]The question was asked, and the witness answered, as follows:

"[By appellant's counsel] Q. Well, doctor, then assuming that, just in the hypothetical sense, that we have two persons such as we do have in this case who are married to each other in a formalized wedding ceremony on December 15th, 1962, the bride being just 19 years old at the time and the groom just 20 years old; assuming further that this couple had first met each other only in June of '62; assuming further that one of the circumstances in the marriage was—and the engagement, was premarital pregnancy on the part of the prospective bride; assuming further that religiously one was a Catholic and one was a Protestant; and assuming further that both the bride and the groom from the time of their birth up to the time of marriage were residents of Marin County, California, but due to an unfortunate accident the husband was killed on January 19th, 1963, the 36th day of their married life. Based on your study, education, research, experience on the subject of stability and instability of marriages, do you have an opinion, doctor, as to whether these factors that I have mentioned would be predictive of success or failure in such a marriage? A. Well, there is no doubt in my mind. Q. Just answer 'yes' or 'no' first; just 'yes' or 'no.' A. Well, you said 'success or failure'?

"Q. Yes.

"A. Predictive of failure."

the Catholic-Protestant type of marriage"), the stability of the marriages of the parties' parents, a combination of such factors, and the statistical facts that, whereas the national rate of marriage failure was "probably 25 divorces and annulments per 100 marriages for the United States as a whole," the rate was 50 per 100 in California and 70 per 100 in Marin County.

At respondent's request, the trial court instructed the jury that it was not to consider the subject of remarriage in its deliberations. The court refused to give a series of instructions, proposed by appellant, which were generally related to the same subject but were explicitly addressed to the issue of damages. The substance of these instructions is hereinafter discussed.

The jury returned a verdict for respondents in the amount of $145,000. Appellant's motion for new trial was denied. On the appeal, it is contended that the trial court erred (we here quote appellant in part) : (1) in ruling evidence of respondent's "quick remarriage" inadmissable; (2) in refusing to require respondent to amend her complaint to show her remarried surname; (3) "in ruling out any mention of . . . [the name] . . . during the trial even to test her credibility in being sworn in otherwise, and in the *voir dire* examination of the prospective jurors"; (4) in giving and refusing the instructions mentioned; and (5) in "unduly restricting cross-examination on premarital pregnancy and other factors relevantly predictive of instability in the marriage." These contentions cannot be sustained; we affirm the judgment.

 Appellant's first contention rests upon the asserted premise that, in a wrongful death action by a surviving spouse, evidence of the plaintiff's remarriage should be admitted for consideration by the trier of fact in mitigation of damages. Such evidence is inadmissible, however, under the rule followed in California (*Benwell* v. *Dean* (1967) 249 Cal. App.2d 345, 355-356 [57 Cal.Rptr. 394] ; *Wood* v. *Alves Service Transp., Inc.* (1961) 191 Cal.App.2d 723, 727-729 [13 Cal. Rptr. 114] [hearing denied] ; *Gallo* v. *Southern Pac. Co.* (1941) 43 Cal.App.2d 339, 346-347 [110 P.2d 1062] [hearing denied] ), and in the majority of American jurisdictions. (*Benwell* v. *Dean, supra*; Annotation, 87 A.L.R.2d 252, 253, 255, 260-263.[6])

---

[6]According to the annotation (which was published in 1963), only Michigan admits such evidence in a wrongful death action. As appellant acknowledges, Michigan has since "joined the majority." (*Bunda* v. *Hardwick* (1965) 376 Mich. 640 [138 N.W.2d 305, 308].) It appears

■ Appellant attempts to distinguish "the pertinent cases" upon the ground that the evidence excluded in each of them involved the speculative "possibility" of remarriage by a surviving spouse[7] whereas in the present case respondent's remarriage had admittedly occurred in fact. Two of the decisions cited above dealt only with the "possibility" (or "probability" or "contemplation") of remarriage by a widowed plaintiff. (*Wood* v. *Alves Service Transp., Inc., supra,* 191 Cal.App.2d 723 at pp. 726, 727; *Gallo* v. *Southern Pac. Co., supra,* 43 Cal.App.2d 339 at pp. 340, 346.) But in the most recent decision cited (which appeared in the reports after the present case had been briefed), the exclusionary rule was held to have been properly applied where the plaintiff had apparently remarried in fact. (*Benwell* v. *Dean, supra,* 249 Cal.App.2d 345 at p. 355 ["Defendant was denied the right to cross-examine plaintiff as to whether she had remarried and as to her new married name."].)

Virtually all the authorities refer to the exclusionary rule as applying to evidence of the fact "or" the possibility of a widowed plaintiff's remarriage. (E.g., *Benwell* v. *Dean, supra,* 249 Cal.App.2d 345 at pp. 355, 356; 87 A.L.R.2d, *supra,* at pp. 252 [title of annotation], 253 [text, § 2, at fns. 8 and 9], 255 [§ 4, subd. (a)], 260 [§ 5]). See comparative discussion in *Reynolds* v. *Willis* (Del. 1965) 209 A.2d 760, 762-763.) A principal reason for the rule is the speculative nature of such evidence as proof in mitigation of damages (*Benwell* v. *Dean, supra,* at pp. 355-356): and evidence of actual remarriage eliminates speculation only as to the event itself, not as to its mitigating consequences. Another reason for the rule is the prospect of undue profit to the defendant (*Benwell* v. *Dean, supra,* at p. 356), which exists whether the plaintiff's

that, among American jurisdictions, only Wisconsin still follows the minority rule. (*Jensen* v. *Heritage Mut. Ins. Co.* (1964) 23 Wis.2d 344 [127 N.W.2d 228, 234].)

[7]As an exception among the "pertinent" cases, appellant notes *Rayner* v. *Ramirez* (1958) 159 Cal.App.2d 372 [324 P.2d 83], where evidence that the widowed plaintiff had *not* remarried was admitted in her wrongful death action and the appellate court noted that it had "some bearing" on the elements of damages in issue. (*Id.,* pp. 382-384.) As noted in subsequent decisions, however, *Rayner* is entirely distinguishable because of its unusual facts, because the evidence was admitted without objection (thereby precluding the defendant from claiming error on the appeal), and because it was properly received for purposes of impeachment. (See *Wood* v. *Alves Service Transp., Inc., supra,* 191 Cal.App.2d 723 at p. 726; *Benwell* v. *Dean, supra,* 249 Cal.App.2d 345 at p. 356.) The distinction eliminates *Rayner* as authority for appellant's contentions in the present case.

remarriage is a fact or a possibility. We conclude that appellant's attempted distinction fails, and that the exclusionary rule applies in a wrongful death action whether or not the plaintiff has remarried in fact.

■ Appellant further contends that the evidence of respondent's remarriage was admissible by legislative mandate, as assertedly expressed in the language of Code of Civil Procedure section 377 (applicable to wrongful death actions and damages therein)[8] and of Civil Code section 3359 (relative to damages generally).[9] The exclusionary rule under attack, however, is an application of the broader doctrine that evidence of conditions occurring after a wrongful death is inadmissible on the issue of damages because the latter are to be determined only by conditions which existed at the time the death occurred. (*Benwell* v. *Dean, supra,* 249 Cal.App.2d 345 at pp. 355-356; *Wood* v. *Alves Service Transp., Inc., supra,* 191 Cal.App.2d 723 at p. 728; *Cervantes* v. *Maco Gas Co.* (1960) 177 Cal.App.2d 246, 251-252 [2 Cal.Rptr. 75]; *Johnson* v. *Western Air Express Corp.* (1941) 45 Cal.App.2d 614, 622 [114 P.2d 688]; *McLaughlin* v. *United Railroads* (1915) 169 Cal. 494, 495-499 [147 P. 149, Ann.Cas. 1916D 337, L.R.A. 1915E 1205]; 87 A.L.R.2d, *supra,* at p. 253.) In *McLaughlin* the Supreme Court, after weighing the broad exclusionary (''American'') rule against the English rule which admits evidence of subsequent conditions, adopted the former upon the stated ground that it was ''more in consonance with justice'' than the English rule. (169 Cal. 494 at p. 499.) In both statutes relied upon by appellant (see fns. 8 and 9, *supra*), the Legislature expressly defined ''justice'' as the essential standard of damages, in a wrongful death action and otherwise. We are not persuaded, therefore, that the exclusionary rule is at variance with legislative policy as appellant contends; and we hold that it was properly applied in the present case.

■ A reference at the trial to the surname respondent bore as remarried, or a reference to her by that name, would obviously have prompted the inference that she had remarried although direct evidence of the fact was inadmissible. Accord-

[8]Insofar as pertinent to appellant's point, section 377 provides that in a wrongful death action ''. . . such damages may be given as under *all* the circumstances of the case, may be *just.*'' (Italics added by appellant.)

[9]''3359. Damages must, in *all* cases, be . reasonable, and where an obligation of any kind appears to create a right to *unconscionable and grossly oppressive damages contrary to substantial justice,* no more than reasonable damages can be recovered.'' (Italics added by appellant.)

ingly, the trial court properly refused to require amendment of her complaint to show her "true" name as remarried.

Arguing to the contrary, appellant relies upon sections 426 [10] and 473 [11] of the Code of Civil Procedure. But section 426 was complied with: respondent's complaint showed a name. Appellant cites no authority for an inflexible requirement that a pleading by a married woman identify her by her husband's surname, and we are aware of none. Section 473 authorizes a trial court to allow a party to amend his or her own pleadings, but we do not read it as requiring a compulsory amendment moved by an opposing party. In any event, the allowance of amendments under section 473 rests in a trial court's discretion. (*Landis* v. *Superior Court* (1965) 232 Cal.App.2d 548, 554 [42 Cal.Rptr. 893]; *Duffey* v. *General Petroleum Corp.* (1949) 93 Cal.App.2d 757, 759 [209 P.2d 986].) Under the circumstances of the present case, the trial court did not abuse its discretion in denying appellant's motion to require respondent to amend her complaint relative to her name.

By the same reasoning, and also within its discretion, the trial court properly prohibited any reference to respondent's remarried name at the trial, or any questioning directed to her on the subject of her name. (Code Civ. Proc., § 1868. See Evid. Code, § 352.) In short, the rule excluding evidence of respondent's marriage either applied or it did not. Since it did apply, as we have held, respondent was entitled to its full benefit. The trial court's actions concerning references to her name were therefore correct. [12]

At respondent's request, the trial court instructed the jury not to consider the subject of remarriage by a surviving spouse in its deliberations. [13] The instruction was wholly con-

---

[10] As pertinent, section 426 provides that "The complaint must contain: 1. . . . the names of the parties to the action. . . ."

[11] As pertinent, section 473 provides that "The court may, in furtherance of justice, and on such terms as may be proper, allow a party to amend any pleading . . . by adding or striking out the name of any party, or by correcting a mistake in the name oᴛ a party, or a mistake in any other respect. . . ."

[12] The court expressly permitted reasonable reference to respondent's present husband, by name, during the *voir dire* examination of prospective jurors. Appellant's contention to the contrary is unsupported by the record.

[13] "In a wrongful death action the subject of remarriage by a surviving spouse cannot be considered for any purpose in arriving at your verdict. You are instructed that it would be a violation of your oaths as jurors to consider such a question during your deliberations in this case."

sistent with the previous—and, as we have seen, correct— exclusion of evidence of her remarriage as an accomplished fact; and, absent such evidence the instruction precluded jury speculation as to the theoretical possibility that respondent had remarried or would remarry in the future. The instruction was properly given.

The first instruction proposed by appellant (No. 12) and refused by the trial court would have told the jury that, if it found "that the surviving widow has voluntarily made personal adjustments in her life which tend to lessen the degree and extent of her alleged loss," such could properly be considered in mitigation of damages. The second (Nos. 16 and 16-A offered in the alternative) would have instructed the jury in effect that damages must be reasonable and—citing and quoting Civil Code section 3359—not "unconscionable and grossly oppressive." The third (No. 13) spoke to the element of "pecuniary loss" as damages, in connection with loss of the decedent's society.

Appellant's proposed instruction No. 12 would unmistakably have suggested to the jury the fact of respondent's remarriage. Since the trial court had correctly excluded evidence of the fact and there was no proof of other "voluntary adjustments in her life," the instruction was not supported by the evidence. ■ The subject matter of appellant's proposed instructions Nos. 16, 16-A and 13 was adequately and correctly covered in other instructions given by the trial court. Refusal of all three proposed instructions, therefore, was proper.

■ Appellant further complains that the trial court unduly restricted cross-examination on "premarital pregnancy and other factors relevantly predictive of instability in the marriage" (of respondent to the decedent). To the extent that it challenges the court's pretrial ruling which prohibited reference to the pregnancy, this contention is untenable: the fact was not relevant when the ruling was made. (Code Civ. Proc., § 1868. See Evid. Code, § 352.)

Appellant now cites the relevance of the premarital pregnancy as derived from the subsequent testimony by Dr. Landis to the effect that the premarital pregnancy and "other factors" were "predictive of failure" of the marriage. But after the fact of the pregnancy had fortuitously emerged in respondent's testimony under proper rulings by the trial court, appellant abruptly terminated the interrogation (see fn. 4, *supra*), and respondent was not thereafter recalled for

any purpose. Cross-examination concerning the pregnancy at any point was restricted by choice, not by any ruling of the court.

As to any "other factor" pertaining to the instability of the marriage, the only restriction of cross-examination by the trial court occurred when the judge sustained respondent's objections to questions directed to (1) her acquaintance with the decedent's parents, and (2) the duration of her engagement. The ruling was correct at the time because neither subject became relevant, if at all, until Dr. Landis testified later. After that, questions concerning the decedent's parents or respondent's engagement would have conceivably been relevant only as they might have led to establishment of the "instability" of a prior-generation marriage, or of a short engagement before respondent's, as "predictive of instability" in the latter. But such relevance—if any[14]—would be heavily counterweighted, at any point in the trial, by remoteness or prejudicial character, or both. This being so, the court's rulings were proper exercises of discretion upon any view of the record. (Code Civ. Proc., § 1868; Witkin, Cal. Evidence (2d ed. 1966) §§ 308, 373, pp. 272, 331.)

█ We have not previously mentioned appellant's final contention, which involves an instruction given by the trial court relative to the discounting of "lost future benefits" according to their "present value." Appellant does not complain of the instruction, but urges that the trial court should have granted a new trial because the jury disregarded it. To show the latter fact on the motion for new trial, appellant produced an affidavit by a juror which stated, in substance and among other things, that the jury, having calculated $145,000 as aggregate damages, made no "present value" computation to produce a lower figure in the verdict. A verdict, however, may not be impeached in such manner (*Kollert* v. *Cundiff* (1958) 50 Cal.2d 768, 772-774 [329 P.2d 897]; *Gonsalves* v. *Petaluma Bldg. Materials Co.* (1960) 181 Cal. App.2d 320, 336 [5 Cal.Rptr. 332]), and the trial court properly disregarded the affidavit. The granting or denial of a new trial otherwise rested in the court's discretion. (*Gon-*

---

[14]The relevance of interrogation concerning respondent's in-laws or her engagement would depend upon the validity and admissibility of the Landis testimony itself. This question is not raised on the appeal and we do not decide it.

*salves* v. *Petaluma Bldg. Materials Co., supra,* at p. 337.) No abuse thereof appears.

The judgment is affirmed.

Devine, P. J., and Christian, J., concurred.

A petition for a rehearing was denied July 3, 1968, and appellants' petition for a hearing by the Supreme Court was denied July 31, 1968.