[Civ. No. 49817. First Dist., Div. One. Apr. 19, 1983.]

ROBERT J. FERREIRA et al.,
Plaintiffs, Cross-defendants and Appellants, v.
QUIK STOP MARKETS, INC., et al.,
Defendants, Cross-complainants and Respondents.

1024

## COUNSEL

Brown & Finney, Robert M. Brown, Stark, Stewart & Simon, Stark, Stewart, Wells & Robinson, William Barry Balamuth and R. Gordon Baker, Jr., for Plaintiffs, Cross-defendants and Appellants.

Norman C. Hile, Jeffrey S. White, James A. Hughes and Orrick, Herrington & Sutcliffe for Defendants, Cross-complainants and Respondents.

## OPINION

**BREINER, J.**\*—In February 1974, plaintiffs Robert and Kristen Ferreira, husband and wife, purchased a franchise to operate a Quik Stop Market, a con-

\*Assigned by the Chairperson of the Judicial Council.

venience grocery and gasoline store. In October 1975, they brought suit against Quik Stop Markets, Inc., the franchisor, seeking damages under several theories: intentional and negligent misrepresentation, breach of the franchise agreement and violation of the Franchise Investment Law. Quik Stop, in turn, cross-complained against the plaintiffs for breach of the franchise agreement. At the conclusion of a lengthy trial, the jury found that defendants had committed no fraud, but awarded plaintiffs $10,000 for breach of contract. The jury further found in favor of Quik Stop on the cross-complaint and awarded Quik Stop $15,616. Judgment was entered in favor of Quik Stop for $5,616.

### FACTS

In 1973, plaintiff Robert Ferreira owned and operated two sporting goods businesses—one in Oakland. He was in the process of selling his partnership interest in the Oakland store. In December 1973, plaintiff learned that a Quik Stop Market on Grand Avenue—just blocks away from his store—was for sale and entered into discussions with the market's owner, Ken Vales. Vales gave plaintiff the quarterly operating statements and monthly purchase records for the market (store No. 46 in the Quik Stop Market chain). Vales told plaintiff how many hours he worked and what his payroll costs were. He showed plaintiff that his net profit from operations was $21,581. Vales also explained that payroll came out of the draw.

Plaintiff Robert Ferreira and his then-fiancee Kristen decided to purchase the market, completed an application, and met with representatives of the Quik Stop Market Company. It is the events at the initial meeting between the Ferreiras and the Quik Stop executives held in January 1974 which form the basis of plaintiffs' claims of fraud.

Plaintiffs presented evidence that Larry Kranich, assistant director of operations, and Joe Yancey, another Quik Stop executive, represented at that meeting that the Quik Stop Market chain was "very successful"; that there had been only one previous failure of a Quik Stop Market;[1] that Quik Stop would provide expert assistance in operating the store whenever needed; that Quik Stop would engage in an advertising campaign to promote store No. 46; that plaintiffs' expected earnings of $20,000 was a reasonable expectation;[2] that plaintiffs should be able to pay off their $25,000 inventory in 11 months; that other Quik Stop stores were earning net profits of $40,000 per year; that store No. 46 was one of the best stores in the system.

---

[1]That failure, coincidentally, was at store No. 46. Yancey and Kranich attributed the failure to the fact that the store owner was too obese to stock his own shelves.

[2]Plaintiffs noted on their application that they expected to earn $20,000 their first year—since Vales' financial statement showed earnings of $21,000.

Yancey and Kranich denied making the alleged statements. Their testimony was supported by testimony of another Quik Stop employee present at the meeting.[3]

In February 1974, plaintiffs purchased the franchise for store No. 46 for $20,000 and began operating the store that same month.

For the first two weeks, a representative from Quik Stop worked in the store with plaintiffs and showed them how to complete the various financial reports. Quik Stop also redesigned the store, relocating the merchandise, stocking the shelves, and changing price labels. These changes were made because Quik Stop's experts believed they would help increase sales.

In April or May 1974, after plaintiffs had operated the store for three months, plaintiff Robert Ferreira met with Quik Stop representatives to review his performance. The accounting statements showed plaintiffs had suffered a loss of approximately $4,000.[4] Quik Stop suggested that plaintiffs reduce their personnel. Plaintiffs did so—firing all but two employees. For a period of time thereafter, plaintiffs worked extra hours in the store themselves.

The next quarterly operating statement (June 30, 1974) showed a net profit from operations of $8,327; the remaining statements for 1974 also showed a net profit from operations. What plaintiffs did not understand was that the "net profit from operations" as shown on those statements did not take into account the weekly $400 draw which plaintiffs had been receiving from Quik Stop. Plaintiffs were aware, however, that their draw was an advance—a draw against future profits—and that payroll expenses came out of the draw.

Later in the year plaintiffs began experiencing problems with theft. The Quik Stop area coordinator suggested training the store employees to watch the customers.[5] Eventually, in the summer of the next year, after rampant customer shoplifting continued, Quik Stop redesigned the store—to put the deli case in the front of the store where it could be watched.

Plaintiffs also had problems with overrings—a method of employee theft —and cash shortages. A tax audit conducted by the Board of Equalization in

---

[3]Plaintiffs eventually signed a franchise agreement which recited that "there have been no representations or warranties of any kind or nature as to the minimum expected or anticipated profits to be derived from owning and operating this market." Plaintiff Robert Ferreira conceded he saw no financial statements for any other stores.

[4]The franchise agreement required the franchisee to maintain a minimum 25 percent gross profit or face cancellation of the franchise.

[5]Subsequently—at the end of 1974—the Quik Stop area coordinator helped discover the reason for the disappearance of entire cases of cigarettes.

May 1977 discovered $73,639 in unreported sales for the period of plaintiffs' operation of the store, 1974-1976. By June 1975, Quik Stop recommended to plaintiffs that they sell the store since they were losing so much money.

Indeed, in May 1975, after about 15 months of operation, plaintiffs decided to sell the market, and listed it for sale for $55,000. By this time, plaintiffs were devoting their time and energy to a newly acquired dry cleaning business. Plaintiff Robert Ferreira's brother took over management of the market in July. Still, the problems continued.[6]

In September 1975, Quik Stop discovered an error which had been perpetuated in the accounting statements for store No. 46. The error first occurred in the March 31, 1974, statement—the first quarter plaintiffs operated the store. Because the gross profits seemed uncommonly low (showing a 9.5 percent loss), the secretary-treasurer of Quik Stop believed the inventory count must be wrong. He manually overrode the computer and used a fictitious figure based on an expected 20 percent gross profit, adding $10,000 to the inventory. Although the inventory was later checked, the $10,000 surplusage added to the records was never removed. This error overinflated the quarterly net profits from operations and was not discovered until September 28, 1975. On September 30, plaintiff Robert Ferreira was informed there was a problem with the inventory adjustment and was invited to a meeting. Plaintiffs did not attend; instead, they immediately filed this action. Eventually, in June 1976, plaintiffs transferred their ownership back to Quik Stop.

At the time of the termination of the franchise agreement, the total amount showing on Quik Stop's records as amounts owed to it by plaintiffs for their inventory, for monthly service fees (a percentage of the gross sales), for advances against profits, and for merchandise and gasoline taken by plaintiffs for their use, but not paid for, was $48,305. This figure was later reduced by $15,000 paid for goodwill when the store was sold to a new owner. In addition, based on the tax auditor's discovery of unreported sales, Quik Stop claimed $9,941 in service fees plus the assessed taxes of $4,000. Quik Stop's total claim on its cross-complaint was $52,493.

As noted earlier, the jury found that Quik Stop had made no misrepresentations, had concealed no facts, and had committed no violations of the franchise laws. The jury found only that Quik Stop had breached the franchise agreement by failing to provide accurate accounting statements. The jury further found that plaintiffs owed Quik Stop $15,616 on the cross-complaint.

This appeal by plaintiffs raises three issues: (1) whether certain evidence was erroneously excluded; (2) whether certain instructions were erroneously re-

---

[6]In September 1975, plaintiffs again listed the store for sale—this time for $35,000 above the franchise fees and inventory.

fused; and (3) whether affidavits by two jurors were admissible to impeach the verdict. For the reasons which follow we find no reversible error in the proceedings and we affirm the judgment.

I

Among the misrepresentations allegedly made by defendants were the statements of Larry Kranich and Joe Yancey that the Quik Stop Market chain was very successful and that the chain had had only one previous failure. Both Mr. and Mrs. Ferreira testified that defendants made such statements at the initial meeting.

At trial, plaintiffs sought to introduce certain evidence purportedly to demonstrate that the statements made by Kranich and Yancey were false—i.e., that the Quik Stop chain had not been "successful"; that there had been more than one "failure." The evidence proffered by the plaintiff, but excluded by the trial court, was as follows:

(1) During the examination of Joe Yancey, counsel for plaintiffs asked: "Q. All right. Now, as of that point in time, Mr. Yancey, was it your understanding that only one franchisee of Quik Stop had ever failed? MR. HILE: Objection, Your Honor. This goes into an area which Your Honor has previously ruled on. MR. BROWN: I don't believe it does. THE COURT: Sustained." The trial court sustained defendants' objection. Plaintiffs made an offer of proof that Yancey would testify that as early as 1972 he knew there had been franchisee failures. Nevertheless, the court excluded the testimony.

(2) During the examination of Larry Kranich, counsel for plaintiffs asked: "Q. You knew, did you not, going into that meeting, that in 1973 there had been more than one failure of a Quik Stop franchisee? MR. WHITE: Objection, Your Honor, to the word 'failure.' THE COURT: Sustained. MR. BROWN: Your Honor, I'd represent in the deposition he understood it and answered it. MR. WHITE: That doesn't mean the question was proper then, Your Honor, and in this context, I would resubmit it is not. THE COURT: Sustained."

██    The trial court disallowed these questions on the ground that the description of a business as a "success" or a "failure" was highly subjective and did not amount to an actionable representation of fact. Indeed, the vagueness of the terms "success" and "failure" was illustrated during the testimony of plaintiff Robert Ferreira. He testified that his sporting goods business had incurred a $5,000 loss for 1973, but nevertheless, he did not consider the business a "failure." (Even plaintiffs' counsel objected to a similar question posed to plaintiff Kristen Ferreira): "Q. Mrs. Ferreira, do you now, sitting here today, have an opinion as to what constitutes a successful business? MR. BROWN:

Well, Your Honor, you know, it seems we ought to have the same rule for everybody, so I will object to that. MR. WHITE: I am just asking if she has one. MR. BROWN: If we are getting into successful businesses, I'd be happy, but if I am not going to get into it, I don't think they should be able to. THE COURT: Sustained." We find no error in the exclusion of the testimony.

(3) Plaintiffs' expert economist witness, Stuart Neffeler, had analyzed the financial statements of *all* the 92 Quik Stop franchisees from 1970-1973. In deciding the relevancy of Neffeler's testimony, the court sought to limit the scope of his testimony. In part, the court ruled that the alleged representations as to the "success" of or lack of "failures" in the market chain were not representations of fact. The trial court also ruled that the proffered evidence was too remote and time-consuming. The court sought to avoid the detailed presentation of the histories of each Quik Stop franchisee and sought to confine the evidence to the facts concerning store No. 46.

But the trial court did not exclude all evidence relating to the financial condition of the Quik Stop market chain. Neffeler was allowed to testify about the profits and sales trends in store No. 46 and overall in the Quik Stop chain and the relative ranking of a store No. 46 in the Quik Stop system.

Plaintiffs now complain that Neffeler was not allowed to testify concerning the long hours spent by franchisees and their low hourly compensation. Such evidence, plaintiffs now contend, was relevant to show "that the Quik Stop system was a dismal failure for the great majority of its franchisees." But such evidence was never proffered below. Plaintiffs concede no offer of proof was made of this evidence, but argue none was necessary since it would have been futile in light of the trial court's rulings on related evidence. We disagree. The trial court did not make any blanket ruling and in fact allowed much of Neffeler's testimony. The claim of error has been waived.

But even if we were to assume that the evidence should have been admitted, any error was completely harmless. Plaintiffs were allowed to introduce Quik Stop's operating statements for 1973 and 1974, thus informing the jury of the true financial condition of the market chain. Plaintiffs' expert, Neffeler, was allowed to testify concerning the market system's sales and profits. There was no evidence that any weakness in the financial condition of the other stores, or of the market chain as a whole, contributed to plaintiffs' difficulties in operating their store.[7] We do not find any reasonable probability that the jury would have returned a different verdict had the excluded evidence been presented (Code

[7]Indeed, the evidence showed that both plaintiffs' predecessor and successor were able to make a profit from their operations of store No. 46. The jury was correctly instructed that it could consider whether or not the Ferreiras' own actions were a superseding cause of their operating losses and loss of their anticipated profits.

Civ. Proc., § 475), and appellants have not sustained their burden of proving injury resulting from the exclusion (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 290, p. 4277).

## II

Among the instructions requested by plaintiffs were two instructions on false promise as a ground of fraud.[8] The trial court refused to give them, apparently reasoning that no evidence had been presented to support such a theory. The jury was instructed only on intentional misrepresentation, concealment, and negligent misrepresentation as grounds of fraud.

█ We find no error in the trial court's ruling. Plaintiffs justify their request for such instructions on the failure of Quik Stop to fulfill its promises (1) to come to the aid of a franchise-holder experiencing difficulties with theft, (2) to engage in an advertising campaign to promote plaintiffs' store, and (3) to provide accurate accountings of the franchisee's financial condition. Although there was evidence to raise a question of fact whether Quik Stop *fulfilled* its promises, there was no evidence to suggest Quik Stop never *intended* to perform. Indeed, the undisputed evidence established that Quik Stop did post promotional signs in the store windows, did provide some assistance to plaintiffs in their efforts to control theft and did provide monthly financial statements, albeit inaccurate statements. There was simply no evidence to support a finding that Quik Stop had no intention of carrying out its promises. The instructions on this theory were properly refused (*DeGeorge* v. *Crimmins* (1967) 254 Cal.App.2d 544, 547 [62 Cal.Rptr. 394]).

In any event, even under the instructions given, the jury found that defendants had made no misrepresentations, concealed no facts. The jury necessarily decided against plaintiffs on this issue; there is no likelihood that the jury would have returned a different verdict had it been instructed on the alternate theory of promissory fraud.

---

[8]"1. The defendants must have made a promise as to a material matter and, at the time they made it, they must have intended not to perform it;

"2. The defendants must have made the promise with an intent to defraud the plaintiffs, that is, they must have made the promise for the purpose of inducing plaintiffs to rely upon it and to act or refrain from acting in reliance upon it.

"3. The plaintiffs must have been unaware of the defendant's intention not to perform the promise; they must have acted in reliance upon the promise and they must have been justified in relying upon the promise made by the defendants.

"4. And, finally, as a result of their reliance upon defendant's promise, the plaintiffs must have sustained damage.

"FRAUD AND DECEIT, PROOF OF INTENT NOT TO PERFORM

"Evidence of prior or subsequent conduct may be considered in determining whether there was an intention not to perform a promise when it was made."

## III

In support of their motion for new trial and to vacate judgment on the cross-complaint, plaintiffs submitted affidavits of two jurors which recited the mental process by which the jurors reached their verdict on the cross-complaint. The affidavits state that the jurors found that the Ferreiras owed Quik Stop $33,305; since Quik Stop had itself breached the franchise agreement by virtue of its accounting error, the jury decided Quik Stop was entitled to only 35 percent of what it was owed, plus the $4,000 in taxes paid by Quik Stop to the Board of Equalization. On the basis of these affidavits, plaintiffs urged the court to vacate the judgment and grant a new trial on the ground of improper conduct by the jurors. Defendants moved to strike the affidavits on the ground that they impermissibly described the thought processes of the jurors. The trial court granted the motion to strike and denied the motion for new trial and the motion to vacate judgment.

Plaintiffs now reiterate their argument below that the jurors misapplied the law. Plaintiffs reason that since the jury found that Quik Stop had performed only 35 percent of its obligations under the franchise agreement, the jury should have found that such material breach precluded Quik Stop from obtaining *any* recovery on the cross-complaint.

The threshold question is whether the juror affidavits disclosing the finding of Quik Stop's 65 percent breach were admissible. The Legislature has limited the situations in which a jury verdict may be impeached: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).) In *People v. Hutchinson* (1969) 71 Cal.2d 342, 349-351 [78 Cal.Rptr. 196, 455 P.2d 132], cert. den. 396 U.S. 994 [24 L.Ed.2d 457, 90 S.Ct. 491], the court interpreted this statute to mean that only proof of overt acts, objectively ascertainable by sight, hearing or other senses, may be used to impeach a verdict. Evidence of the jurors' subjective reasoning processes is inadmissible.

Thus, in *Hutchinson,* the court held the juror affidavits reciting remarks of the bailiff and the tone of their delivery constituted evidence of objectively ascertainable statements and conduct and were therefore admissible at the motion for new trial. More recently, in *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 80-82 [137 Cal.Rptr. 863, 562 P.2d 1022], the court held admissible juror affidavits which declared that the jurors had discussed the subject of attorneys'

fees and specifically agreed to increase the verdict to include such fees. The court reasoned that the discussion and the agreement were "matters objectively verifiable . . . ."

The case at bar is readily distinguishable. There were no external influences exerted on the jurors; there was no agreement among the jurors to use a patently improper formula. Instead, the affidavits recite only the reasoning processes of the jurors. Such evidence is not admissible to impeach a verdict. (E.g., *Aronowicz* v. *Nalley's, Inc.* (1972) 30 Cal.App.3d 27 [106 Cal.Rptr. 424] [jury assumed there were 100 shareholders]; *People* v. *Turner* (1971) 22 Cal.App.3d 174 [99 Cal.Rptr. 186] [jury deadlocked until they used magnifying glass to identify defendant in photograph]; *Continental Dairy Equip. Co.* v. *Lawrence* (1971) 17 Cal.App.3d 378 [94 Cal.Rptr. 887] [jury did not analyze evidence]; *Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062 [91 Cal.Rptr. 319] [jury believed plaintiff had settled with one defendant]; *Cherrigan* v. *City etc. of San Francisco* (1968) 262 Cal.App.2d 643 [69 Cal.Rptr. 42] [jury did not calculate present value of plaintiff's damages]; see *Bossi* v. *State of California* (1981) 119 Cal.App.3d 313 [174 Cal.Rptr. 93] [jurors not in agreement on special verdicts].)

Plaintiffs rely on *Drust* v. *Drust* (1980) 113 Cal.App.3d 1 [169 Cal.Rptr. 750], in which a divided court held admissible affidavits from all 12 jurors reciting the several components of the total award of damages. The components included an award of future expenses necessary to earn income, which the court determined was inconsistent with another component—an award of lost future income.

*Drust* appears to be an anomaly and is inconsistent with the clear language of Evidence Code section 1150, subdivision (a). We decline to follow *Drust*, believing that we are bound by legislative mandate and by the California Supreme Court's decisions in *People* v. *Hutchinson, supra*, 71 Cal.2d 342, and *Krouse* v. *Graham, supra*, 19 Cal.3d 59 (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]).

In *Hutchinson*, the court distinguished between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . ." (71 Cal.2d at p. 349.) It is only those influences which are "open to sight, hearing, and the other senses" which may be the subject of a juror affidavit (at p. 350). Under that reasoning, the court in *Hutchinson* allowed juror affidavits regarding improper *statements* made to the jury by a bailiff.

In *Krouse*, the Supreme Court consistently held that affidavits showing *discussions* among the jurors are admissible, since they are objectively

verifiable and subject to corroboration. But the Supreme Court has not gone as far as the *Drust* court, which allowed affidavits showing *how* the verdict was reached. As the dissenting opinion in *Drust* states (113 Cal.App.3d at p. 12), "No amount of semantics or legal legerdemain can convert a jury's mathematical computations from a 'mental process' to an 'overt act.'" *Drust* takes *Krouse* a step farther than permissible, and was wrongly decided.

In any event, *Drust* would not apply to the facts here. The submission of affidavits from all 12 jurors, as was the case in *Drust,* is far different from the conclusions of 2 jurors in this case, hypothesizing the subjective thinking processes of all the jurors. Clearly, this case is governed by *Aronowicz, Putensen* and *Cherrigan, supra,* and not by *Drust.*

■ Even if the affidavits here were admissible, we do not find any defect in the jury's verdict. The jury was instructed that Quik Stop could recover, despite its own breach of the franchise agreement, only if Quik Stop substantially performed its obligations. The jury expressly found that Quik Stop *did* substantially perform its contractual promises; that the accounting error did not obviate Quik Stop's substantial performance. We find nothing internally inconsistent about the jury's verdict. Nor was the award of damages to Quik Stop contrary to law or fact. If any party suffered any prejudice, it was Quik Stop, who was injured by the jurors' use of a comparative fault formula to *reduce* its award; plaintiffs suffered no harm.

The judgment is affirmed.

Newsom, Acting P. J., and Holmdahl, J., concurred.