[No. C002672. Third Dist. July 25, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY DONELL RHODES, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through VI.

**COUNSEL**

Thomas M. Anderson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary A. Binkerd, David De Alba and Garrick Chock, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOTLAND, J.**—Defendant appeals after a jury convicted him of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1] and found true the allegation that defendant personally used a handgun within the meaning of section 12022.5. The court found true an additional allegation that defendant had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a), and sentenced him to an aggregate prison term of 13 years.

In the published portion of this opinion, we decide when a court must provide a convicted defendant with the names, addresses and telephone numbers of jurors for use in investigating possible juror misconduct. Balancing the competing public-policy interests discussed below, we conclude that disclosure of juror names, addresses and telephone numbers is required only when a defendant, upon timely motion, makes a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.

## FACTS

On the afternoon of his death, Juan Nunez was socializing at a Stockton bar with his girlfriend, Josefina, and several of their friends. Earlier that day Nunez had been at a flea market where he had consumed four or five large cups of beer. Nunez, who appeared to be happy as he continued to drink and play pool, occasionally left the bar to use a telephone outside.

Across the street was Pat's Liquor Store, owned by defendant's mother and stepfather, Avon Daniel. Daniel had just dumped some garbage in a dumpster in the store's parking lot when he heard a noise coming from a nearby telephone. He saw Nunez pounding on the telephone, asked Nunez not to damage it, and walked back toward the store. Nunez followed, yelling "in a raving voice" and making high, karate-style kicks. Nunez began throwing bottles, some of which landed inside the liquor store, but none of which hit Daniel. Nunez then ran off. According to defendant's sister, who also was working at the liquor store, Daniel cleaned up the glass inside the store while she telephoned the police.

. Nunez returned about 10 minutes later holding a broken bottle. Defendant and his then-fiancee, Suzette Rhodes, soon arrived at the liquor store.

---

[1] All further statutory references are to the Penal Code unless noted otherwise.

Nunez stood about six feet away from them waving the bottle. Shortly thereafter, Nunez appeared at the door "with his fist up" and told Daniel to "come on, mother fucker." Defendant and Daniel went after Nunez. However, when Nunez made karate motions toward them, defendant and Daniel retreated into the liquor store where each obtained a handgun. They ran outside, shot into the air, and Nunez fled.

Defendant and Daniel returned to the store. After putting his handgun into a cabinet, defendant began to clean up. He later retrieved the gun and went outside to do some sweeping. Nunez's girlfriend, Josefina, and another woman approached defendant and asked why he was fighting with Nunez. Defendant and Daniel, who also had come outside, replied that Nunez had thrown bottles at them. At that point, Nunez came running toward them, yelling in Spanish that he didn't want any problems. One percipient witness testified that Nunez also said, "wake," which she described as broken English for "wait," and held his hands in a gesture of surrender.

As Nunez approached, defendant pulled the handgun from his waist. Daniel told defendant not to shoot Nunez, but defendant held the gun to Nunez's neck and fired. Nunez, who also had a blunt force injury at his left eyebrow area, died almost immediately from the near-contact gunshot wound to his neck.[2]

Defendant returned to the liquor store, telling his fiancee, "I got to go." He put down the gun and fled through a side door. Soon thereafter, defendant's fiancee picked him up in a car and drove him to his grandmother's house. From there, defendant went to his aunt's house, where he hid for two days before surrendering to the police.

Defendant testified that as he was telling the victim's girlfriend about the bottle throwing, someone yelled "look out." Defendant turned, pulling the handgun from his waistband, and saw Nunez coming at him. Defendant struck Nunez in the face with the gun, which discharged by accident.

I

Defendant filed a motion for new trial asserting, among other things, jury misconduct. The motion was supported by a conclusory, hearsay affidavit of defendant's trial attorney, who stated: "Following the jury verdict, the investigator for the defense was able to contact two of the jurors by telephone. From the comments made by one of these jurors, it is highly probable that the jury, following the improper argument of the District Attorney,

---

[2] At the time of his death, Nunez had a blood-alcohol level of .27 percent.

considered [defendant's] status as an ex-convict for purposes other than impeachment and saw in it a prior disposition. To adequately explore this issue, it will be necessary that every juror be contacted and interviewed in depth . . . To accomplish this investigation, defendant . . . respectfully asks for the sum of $500.00 to cover investigative fees."

On the day set for hearing on the new trial motion, defense counsel offered to have the investigator tell the court the results of his conversations with the two jurors. The court rejected this proposal and offered to continue the hearing so defendant could furnish the court with juror affidavits. Defense counsel then requested the name, address and telephone number of the foreman of the jury. The request was denied. Counsel also requested a transcript of jury voir dire to support a claim of *Wheeler* error,[3] but did not obtain a ruling by the court. Similarly, defendant did not secure a ruling on his request for investigative fees. At the end of the hearing, defense counsel stated she was unable to proceed further since she had contacted the only two jurors she could by using the telephone directory, and because the court had not provided the jurors' names, addresses and telephone numbers or granted funds for an investigator. The hearing was then continued.

Five weeks later, the motion for new trial was heard. Defendant's investigator was allowed to testify that he spoke with two members of the jury by telephone. When the investigator was asked what the jurors said, a hearsay objection was sustained. Defense counsel then made an offer of proof concerning the jurors' statements, and complained that she was unable to obtain affidavits because the court denied the request for jurors' names, addresses and telephone numbers. Counsel further complained that she could not adequately prepare for the motion for new trial because she did not have a trial transcript. Finally, counsel stated, "With that, I would submit that I can proceed no further on the motion for new trial because I simply do not have the tools necessary at this point in time." Counsel closed by threatening to pursue immediate relief from the Court of Appeal if the trial court denied the motion for new trial.[4] The court denied both the motion and defendant's request for a continuance.

■ Defendant now contends that denial of his request for juror names, addresses and phone numbers, the failure of the court to authorize investigation fees and provide defendant with a transcript of jury voir dire, and the

---

[3] *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

[4] Defendant's counsel stated: "After the Court makes it's [*sic*] ruling, I am going to ask for one week's continuance for sentencing and for the purposes of filing a notice of the writ. In this matter, the motion for new trial . . . is denied, if I am denied a transcript, if I am denied funds for an investigation, then I can not adequately prepare a motion for new trial and my only remedy is to go to the Appellate Courts to see if they will help me get the tools."

denial of his motion for continuance precluded counsel from effectively representing defendant at the motion for new trial. According to defendant, "the court's interference with [the] right to effective counsel constitutes error requiring reversal of the judgment." We disagree.

Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests.

The jury is a cornerstone of our nation's judicial system. In California, the inviolate right to trial by jury is guaranteed by article I, section 16 of the California Constitution. As a matter of public policy, the integrity of our jury system must be carefully safeguarded. (See *Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104].)

The continuing viability and vitality of the jury process depends on public support and participation by a diverse and representative cross-section of our communities. While we recognize the importance of voir dire in obtaining an impartial jury (*People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869]), the increasing scrutiny being placed on prospective jurors may make it more difficult to obtain willing participants in this vital civic duty. Prospective jurors often are subjected to tedious voir dire which delves into the most personal aspects of their lives. In some cases, jurors are required to fill out lengthy, detailed questionnaires which seek to expose their innermost thoughts. Occasionally, parties employ experts to analyze the backgrounds and personalities of prospective jurors to assess their suitability for jury duty in a specific case. Most trial judges undoubtedly would confirm that prospective jurors often feel as if they are on trial, and some jurors openly express resentment of the process.

Permitting parties in a lawsuit as a matter of right to have addresses and telephone numbers to contact and interrogate jurors about their verdict would further jeopardize our jury process. As noted by our Supreme Court, "once aware that after sitting through a lengthy trial he himself may be placed on trial, only the most courageous prospective juror will not seek excuse from service." (*Linhart* v. *Nelson, supra,* 18 Cal.3d at p. 644.)

Few would quarrel with the proposition that the willingness of people to serve on a jury would be chilled by the knowledge that, once deliberations are complete, a party to the action may have unlimited access to the home address and telephone number of each juror.

Our jury system also depends upon adherence to the public policy which discourages harassment of jurors by losing parties seeking to have the verdict set aside. (*McDonald* v. *Pless* (1915) 238 U.S. 264, 267 [59 L.Ed 1300,

1302, 35 S.Ct. 783].) It takes little imagination to recognize that disclosure of jurors' addresses and telephone numbers has the potential to run afoul of the important interest in protecting jurors against annoyance or embarrassment.

Such disclosure also may foster conduct which undermines another strong public policy: the reduction of incentives for jury tampering. "A single juror who reluctantly joined in a verdict is likely to be sympathetic to the overtures of defeated parties, and to be persuadable to the view that his own consent rested upon false or impermissible considerations; the truth will be hard to ascertain. In the process, the trier itself will be tried, all at the behest of a dissatisfied party aided by the second thoughts of a vaguely uncomfortable juror." (Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)* (1978) 57 Neb.L.Rev. 920, 924.)

Another vital public policy seeks to promote free and open discussion among jurors. "[I]f jury deliberations are subject to compulsory disclosure, independent thought and debate will surely be stifled." (*Linhart* v. *Nelson, supra,* 18 Cal.3d at pp. 644-645.)

In addition, the public has a recognized interest in promoting the finality of verdicts. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 575 [224 Cal.Rptr. 664, 715 P.2d 624], Mosk, J. conc.) Unlimited disclosure or juror addresses and phone numbers would undoubtedly encourage parties to engage in an intrusive and lengthy inquiry into the deliberation process in search of information with which to impeach the verdict. Justice Mosk in his concurring opinion in *Ballard* v. *Uribe, supra,* aptly stated: "I must express my apprehension at an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. Giving such appeals and petitions any credence prevents the finality of judgments, places additional burdens on the judicial process, and contributes to disenchantment with the . . . system . . . . [¶] Justice is not served by tiresome replays of jury deliberations . . . . [¶] It would be a grave disservice to the integrity of the jury system and to the finality of judgments if we were to encourage probing into the subjective reasons behind [a] verdict . . . . What is worse, traditional jury secrecy will be at an end. Such a result would be regressive and counterproductive to the orderly and effective administration of justice." (*Id.,* at pp. 575, 577-578.)

■ On the other hand, there exists a "strong public interest in the ascertainment of the truth in judicial proceedings, including jury deliberations." (*People* v. *Atkins* (1988) 203 Cal.App.3d 15, 27 [249 Cal.Rptr. 863].) A verdict reached by prejudicial juror misconduct must not be permitted to

stand. (Pen. Code, § 1181, subds. 2, 3 & 4; Code Civ. Proc., § 657, subds. 1 & 2.) Lifting the veil of postverdict secrecy to expose juror misconduct serves an important public purpose. " '[T]o hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them.' " (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 350-351 [78 Cal.Rptr. 196, 455 P.2d 132], quoting *Wright* v. *Illinois & Miss. Tel. Co.* (1866) 20 Iowa 195, 211.)

Another public policy involved is the right of privacy guaranteed by article I, section 1 of the California Constitution. The wholesale disclosure of jurors' names, addresses and telephone numbers clearly has an impact on a juror's right to privacy. ■ However, this court has noted that " '[t]he constitutional right of privacy is not absolute; it may be abridged to accommodate a compelling public interest.' " (*El Dorado Savings & Loan Assn.* v. *Superior Court* (1987) 190 Cal.App.3d 342, 345 [235 Cal.Rptr. 303], quoting *Moskowitz* v. *Superior Court* (1982) 137 Cal.App.3d 313, 316 [187 Cal.Rptr. 4].) "When the right to disclosure of information conflicts with the constitutional right of privacy, there should be a 'careful balancing' of the 'compelling public need' for discovery, against the 'fundamental right of privacy.' " (*City and County of San Francisco* v. *Superior Court* (1981) 125 Cal.App.3d 879, 882 [178 Cal.Rptr. 435].)

It is within the context of these competing interests that we analyze the right of the defendant here to obtain the names, addresses and telephone numbers of the jurors who found him guilty of criminal misconduct.

■ Although differing in their reasoning, appellate courts have held that the master list of qualified jurors, including names and addresses, is a judicial record subject to public disclosure. (*Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258, 262 [198 Cal.Rptr. 489]; *Lehman* v. *City and County of San Francisco* (1978) 80 Cal.App.3d 309, 312 [145 Cal.Rptr. 493].) While the law favors disclosure of judicial records, *the right of access is not absolute.* Nondisclosure may be appropriate "for compelling countervailing reasons." (*Pantos, supra,* at p. 263; see also *Black Panther Party* v. *Kehoe* (1974) 42 Cal.App.3d 645, 651-652 [117 Cal.Rptr. 106]; Gov. Code, § 6255.) For example, the *Pantos* court upheld nondisclosure of juror questionnaires used by the jury commissioner to develop a master jury list. The court found a potential for misuse of this information and reasoned that disclosure "would breach a juror's reasonable expectation of privacy and would undercut efforts to encourage citizen participation in the justice system." (151 Cal.App.3d at p. 265.) Accordingly, the court found: "Public

interest in withholding such questionnaires outweighs the public's interest in disclosure."[5] (*Ibid.*)

In *People* v. *Atkins, supra,* 203 Cal.App.3d 15, the court upheld the denial of a convicted defendant's request for the release of juror addresses and phone numbers to use in pursuing a motion for new trial because the request was untimely. Yet, in dictum, the court undertook to delineate guidelines for evaluating timely requests. In so doing, the court engaged in a balancing of interests. Addressing only the constitutional right of privacy, *Atkins* concluded that the strong public interest in the ascertainment of the truth in judicial proceedings outweighed the "limited and narrow intrusion of releasing the names and addresses of the jurors." (*Id.,* at pp. 27-28.)

In reaching this conclusion, *Atkins* did not consider all competing public policy interests. ■ As noted earlier, the right to privacy is not the only countervailing public policy. The public also has strong interests in maintaining the integrity of our jury system, including encouraging public participation in the process, fostering free and open discussion among jurors, promoting verdict finality, reducing incentives for jury tampering, and discouraging harassment of jurors by losing parties eager to have the verdict set aside.

Courts repeatedly have recognized the potential for abuse which may flow from the unlimited release of juror information. For example, in *People* v. *Scott* (1982) 129 Cal.App.3d 301 [180 Cal.Rptr. 891], a defense investigator went to the homes of jurors and, when the jurors either refused to discuss the matter or to give an affidavit, served them with subpoenas. "To grant this kind of power to the losing attorney would open the door to harassment of jurors and . . . ultimately damage the jury process and the administration of justice." (*Id.,* at p. 308.) A similar warning was issued in *United States* v. *Moten* (2d Cir. 1978) 582 F.2d 654, 665: "A serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts."

There is an appropriate middle ground which can harmonize and satisfy the competing societal interests discussed above. ■ We conclude that, upon timely motion, counsel for a convicted defendant is entitled to the list

---

[5] *Pantos* and *Lehman* found no fault in the *pretrial* disclosure of master jury lists. However, no compelling, countervailing reasons were presented to justify nondisclosure of this information. (See *Pantos, supra,* 151 Cal.App.3d at p. 263.)

of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. Dictum in *People* v. *Atkins, supra,* supports our holding. *Atkins* clearly implies that a showing of probable juror misconduct is required and finds that requirement satisfied by the inference to be drawn from the brevity of deliberations. (203 Cal.App.3d at pp. 25-26.) *Atkins* also implies that the defendant must show that he attempted to use means less intrusive on juror privacy to obtain information concerning probable juror misconduct. (*Id.,* at p. 28.)

Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information as a matter of right in each case. This rule safeguards both juror privacy and the integrity of our jury process against unwarranted "fishing expeditions" by parties hoping to uncover information to invalidate the jury's verdict. At the same time, it protects a defendant's right to a verdict uninfluenced by prejudicial juror misconduct by permitting, upon a showing of good cause, access to juror information needed to investigate allegations of juror misconduct.[6]

■ Although we recognize that judicial records are exempt from the California Public Records Act (*Pantos* v. *City and County of San Francisco, supra,* 151 Cal.App.3d at p. 262; *Estate of Hearst* (1977) 67 Cal.App.3d 777, 782 [136 Cal.Rptr. 821]; but see *Lehman* v. *City and County of San Francisco, supra,* 80 Cal.App.3d at p. 312), our holding is similar to the act's disclosure provisions set forth in Government Code section 6255. This section provides that the agency seeking to withhold a public record must demonstrate that "on the facts of the particular case the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record."

Our holding also is consistent with the practice of federal courts, where a party must make a preliminary showing of juror misconduct in order to obtain a hearing thereon. "[A] trial court is required to hold a post-trial hearing only when reasonable grounds for investigation exist. . . . [¶] [W]here no foundation has been established. . . . a hearing is not held to

---

[6] A showing of good cause to obtain juror names, addresses and phone numbers does not give counsel license to abuse the information. Jurors "retain a clear right to refuse to talk to counsel[,] and counsel has a duty not to harass or embarrass the jurors. (Rules Prof. Conduct of State Bar, rule 7-106, subd. (D).)" (*People* v. *Atkins, supra,* 203 Cal.App.3d at p. 27.)

afford a convicted defendant the opportunity to conduct a fishing expedition." (*U.S.* v. *Dinorscio* (D.C.N.J. 1987) 661 F.Supp. 1041, 1042-1043; see also *United States* v. *Sedigh* (5th Cir. 1981) 658 F.2d 1010, 1014; *United States* v. *Brantley* (11th Cir. 1984) 733 F.2d 1429, 1439-1440; 3 Louisell & Mueller, Federal Evidence (1979) § 291, pp. 155-159.) In fact, some federal circuits require a preliminary showing of juror misconduct before permitting counsel even to conduct postverdict interviews of the jurors. (*United States* v. *Chavis* (5th Cir. 1985) 772 F.2d 100, 110; *Smith* v. *Cupp* (9th Cir. 1972) 457 F.2d 1018, 1100; *United States* v. *Moten, supra,* 582 F.2d at p. 665.)

Requiring a preliminary showing does not preclude a defendant from uncovering jury misconduct. For example, counsel and investigators routinely interview jurors before they leave the courthouse. Parties also have access to other means, like a public telephone directory as used in this case, to contact jurors. Moreover, without solicitation by the parties, incidents of juror misconduct have been brought to the attention of the court or counsel by conscientious third parties who learn of the misconduct. Accordingly, we conclude that application of the rule stated herein does not unduly infringe upon a defendant's ability to discover juror misconduct and is mandated by the proper balancing of competing public interests.

■ We now turn to the question whether defendant made an adequate showing to justify release of the juror information requested in this case. Defendant was unable to obtain affidavits from the two jurors who initially spoke with the defense investigator, because they no longer wished to discuss the matter with the defense. Accordingly, counsel made an offer of proof concerning the investigator's conversations with the jurors. We need not decide whether an investigator's hearsay statement alone, without an accompanying juror affidavit, is competent proof for a preliminary showing of juror misconduct, because the offer of proof in this case was insufficient on its face. According to the investigator, one juror "gave an indication that the basis of the decision in the case was that they [the jurors] felt that since he [defendant] was an ex-convict that simply because he picked up a gun that he was wrong and therefore he must be guilty." To the extent this offer of proof revealed the thought processes of the juror with whom the investigator spoke, it does not establish a ground for juror misconduct because a verdict may not be impeached by inquiry into the jurors' mental or subjective reasoning process. No evidence is admissible to show the effect certain evidence had upon a juror either in influencing the juror to assent to or dissent from the verdict or concerning the mental processes by which it was determined. (Evid. Code, § 1150; *People* v. *Hutchinson, supra,* 71 Cal.2d at pp. 349-350; *Ferreira* v. *Quik Stop Markets, Inc.* (1983) 141 Cal.App.3d 1023, 1033-1034 [190 Cal.Rptr. 778].) To the extent the offer of proof

suggests that the jurors engaged in inappropriate discussions during deliberation which may have improperly influenced the verdict, the investigator's statement is too vague and conclusory to constitute an adequate preliminary showing of juror misconduct. (Evid. Code, § 1150.) Similarly, counsel's statement that a juror "gave an indication that the foreman cut short deliberations" also is an inadequate showing of possible misconduct, because it simply is a conclusory comment which does not set forth with specificity "statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150; see also King v. United States (2d Cir. 1978) 576 F.2d 432, 438.)

Having failed to provide an adequate, preliminary showing of misconduct, defendant was not entitled to discovery of the jurors names, addresses and telephone numbers; and the trial court did not err in denying defendant's motion.

■ As to the transcript of jury voir dire and the authorization of investigation fees, defendant did not secure rulings on his motions. " '[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court *actually rule*. If the point is not pressed and is forgotten, he may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place.' [Citations.]" (*People* v. *Obie* (1974) 41 Cal.App.3d 744, 750 [116 Cal.Rptr. 283] (overruled on another ground, *People* v. *Rollo* (1977) 20 Cal.3d 109, 120, fn. 4 [141 Cal.Rptr. 177, 569 P.2d 771]), quoting Witkin, Cal. Evidence (2d ed. 1966) § 1302, p. 1205.)

By failing to press the trial court for a ruling on the transcript and investigation fees, defendant has waived the right to raise his claims of error. Even if the issues were properly before us, we find no reversible error.

The right to effective counsel encompasses the right of an indigent and his appointed counsel to have the services of an investigator. (Pen. Code, §§ 987.2, 987.8; *Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 319-320 [204 Cal.Rptr. 165, 682 P.2d 360]; *Puett* v. *Superior Court* (1979) 96 Cal.App.3d 936, 938-939 [158 Cal.Rptr. 266].) ■ "However, it is only *necessary* investigative services to which an indigent defendant is entitled, and a motion for the appointment of an investigator at public expense must be supported by a showing that the investigative services are reasonably necessary." (*Puett* v. *Superior Court, supra,* at p. 939.)

As already noted, defendant failed to make a sufficient showing of need to investigate. Defense counsel even admitted, "I'm not saying that there was

jury misconduct . . . [M]y request was for funds to be provided to conduct an adequate investigation so we could tell whether or not there was jury misconduct. . . ." A court is not required to authorize investigative funds for what would amount to a mere "fishing expedition."

Moreover, the record clearly indicates that, even without court ordered funding, the investigator continued to provide services in an effort to establish juror misconduct. Thus, defendant suffered no prejudice when the court did not grant the request for funds to further investigate the possibility of juror misconduct.

■■■  Similarly, no error arose when the court did not grant defendant's motion for a transcript of jury voir dire. As noted in *People* v. *Lopez* (1969) 1 Cal.App.3d 78, 82 [81 Cal.Rptr. 386], a defendant is not entitled as a matter of right to a reporter's transcript of the proceedings for use in a motion for new trial. The denial of such a motion is not error absent a showing that it violated due process and denied defendant effective representation of counsel. (*Id.,* at p. 83.)

Here, defense counsel wanted the transcript simply to attack, once again, the prosecutor's use of a peremptory challenge to excuse a Black prospective juror. Yet, without the transcript, counsel exhibited a detailed recollection of the voir dire in question. Thus, defendant has failed to show that lack of the transcript deprived him of effective assistance of counsel. Moreover, in the unpublished portion of this opinion, we find that there was no *Wheeler* error. Accordingly, defendant was not prejudiced by the inability to obtain the reporter's transcript of jury voir dire.

■■■  Lastly, we find that the court did not abuse its discretion in denying defendant's motion for a continuance. A continuance may not be granted in a criminal case absent a showing of good cause. "Whether a defendant has affirmatively demonstrated that justice requires a continuance is a factual matter and, in the absence of an abuse of discretion, the trial court's determination will not be disturbed on appeal. [Citation.]" (*People* v. *Weston* (1981) 114 Cal.App.3d 764, 777 [170 Cal.Rptr. 856].)

Defendant now claims that a continuance was necessary to properly investigate possible jury misconduct, to locate certain jurors, and to raise money to pay for an investigation. However, these assertions were not made in the trial court. Defense counsel simply stated she would "ask for one week's continuance for sentencing and for the purpose of filing a notice of the writ." She later asked for "at least one week, because I do wish to have time to correct many errors I believe that are in the probation report; and secondly, I would like to file a statement in mitigation . . . ." Observing

that the sentencing hearing had been "set quite some time ago, and all parties should be ready . . . ," the court denied the request for a continuance.

The sentencing hearing, initially set for April 20, 1987, nearly four weeks after the end of trial, was ultimately held on May 26, two months after the verdict. The probation report was received by the court on April 10, 1987, and the statement in aggravation was served on April 15. Defense counsel had ample time to identify errors in the probation report and file a statement in mitigation. Under the circumstances, the court did not abuse its discretion in concluding that a further continuance was unwarranted.

II-VI*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Marler, J., concurred.

---

*See footnote, *ante,* page 541.