Filed 4/11/16  P. v. Garcia CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR MANUEL GARCIA,<br><br>    Defendant and Appellant. | D068192<br><br><br><br>(Super. Ct. No. SCD256560) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Victor Manuel Garcia of crimes involving domestic violence against the mother of his children, N.P.: sodomy by force (Pen. Code, § 286, subd. (c)(2)(A)); forcible rape (Pen. Code, § 261, subd. (a)(2)); two counts of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)); and threatening to commit a crime that would result in death or great bodily injury to N.P. (Pen. Code, § 422). The crimes occurred in November 2013. On appeal, Garcia challenges (1) the admission of evidence regarding prior acts of domestic violence; (2) the omission of jury instructions on mistake of fact regarding consent; and (3) the trial court's denying his request for jurors' contact information. We conclude Garcia has not established any reversible errors, and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The evidentiary portion of trial began on April 27, 2015, and concluded on April 30, 2015. The next day, the jury returned guilty verdicts on all counts. A summary of the evidence follows.

In 2007 or 2008, Garcia was homeless, and N.P. invited him to live with her and her children from a prior relationship. Her children were Jose C., R.C., and Abraham C., ages 20, 18, and 11, respectively, at time of trial. When N.P. became pregnant with her and Garcia's first child together in 2008, he began abusing her. He hit her and tried to punch her in the stomach, while saying, "I'll make you lose the baby." N.P. curled up in a ball to protect her stomach. On another occasion, Garcia headbutted and pushed her into the bathtub. She continued to be physically and emotionally abused by him throughout

2

their dating relationship. They have two children together, Ethan G. and Carlos G., ages six and five at time of trial.

Several witnesses described N.P. as very nice, but relatively "slower," "low functioning," and/or developmentally delayed. She could read a little bit and had a sixth grade education. N.P. and Garcia relied on her welfare checks, and he was mostly unemployed. In addition, they regularly smoked marijuana and methamphetamine together. Their relationship was plagued by drugs, money, and childcare issues. N.P.'s children testified that they had witnessed various forms of domestic violence, Garcia calling N.P. derogatory names ("bitch," "whore," etc.), and him drinking "a lot" of beer. Jose testified that, while he lived in the house, he had once intervened in an argument between N.P. and Garcia right before Garcia was going to hit his mother. R.C., who had lived with them as well, had personally observed Garcia hit, punch, and slap N.P.

N.P. estimated that she was hit at least three or four times a month, typically in the arms, legs, and feet, and occasionally on her face. Garcia slapped her, punched her, and used a "stick that he would use for the dogs" to strike her. The stick was 18 inches long and four inches in diameter. N.P. and several witnesses testified that Garcia called the stick a "nigger beater," while he claimed it was called a "jaw breaker." Garcia once used a broom to hit N.P.'s back, and he had thrown toys at her.

In September 2008, Garcia punched N.P. in the nose right before she had to walk Abraham to school. Abraham saw his mother bleeding, swollen, and bruised. At school, a social worker observed N.P. holding two-week-old baby Ethan, with blood on her face, a bloody nose, a cut, and a bruised neck. A school police officer said N.P. had "straight

3

eyes" and a "zombie[]like" appearance. A different police officer later observed "red marks" on N.P.'s neck and a cut on the bridge of her nose. N.P. did not reveal Garcia's identity to these officers. At trial, she testified that she would not call the police on Garcia because she lived in fear of him coming back to harm her. Garcia would frequently threaten to kill or harm N.P.

Officials became involved in the family's welfare again in October 2010, when Garcia punched then six-year-old Abraham in the stomach. Abraham's school nurse testified that Abraham arrived late to school, complained of a "stomachache," and eventually disclosed that Garcia had punched him for not taking out the trash. Garcia often abused Abraham for not properly doing chores.

Over the years, N.P. occasionally confided in her closest friends about Garcia's abusive behavior. Garcia would break her cell phones, and one time, Garcia ripped up "every piece" of her clothes and chased her out of the house. Crystal La Faye, N.P.'s close friend, testified that N.P. would come to Crystal's house when she had been "thrown out" of her own home by Garcia, and on various occasions, N.P. had told her about being hit and having her phone destroyed. Colleen Lugo, another close friend, periodically observed injuries on N.P. Victoria Lucero, N.P.'s former neighbor, had heard Garcia and N.P. arguing and yelling at each other, and once observed N.P. with a bloody nose. N.P.'s friends advised her to leave Garcia, but N.P. was scared of him, of further violence to herself or her children, and of his threats. In addition to threats of killing her, Garcia would threaten to take Ethan and Carlos away from her and move to Virginia, where Garcia's mother lived.

4

By November 2013, N.P. and Garcia's relationship had severely deteriorated, and things were "very bad." On November 5, 2013, Ethan tearfully reported to his school teacher that "his dad hits his mom," and "his dad likes to beat up people." Also, Ethan told his teacher that "sometimes his mom has to leave, but his parents live together because they are [a] family." Garcia was hitting N.P.'s legs using his stick, punching her arms, and had thrown a remote control at her face, injuring her jaw. Garcia had also threatened to beat up Jose and rape R.C. In the same early November timeframe, N.P. decided and informed Garcia of the fact that she no longer wanted to have sex with him. Nevertheless, Garcia was forcing her to have sex against her will and escalating his physical abuse.

On November 11, 2013, which was Veteran's Day, N.P. testified that she was angry and "not talking" to Garcia because he had hit her and forced her to have sex with him the night before. The family went to a park for a barbeque during the day with Garcia's brother and other family members. N.P. ignored Garcia at the park, and he said she would "pay for it" later when they got home. Garcia had been drinking and doing drugs throughout the day. Back at the home after others had left, R.C. stayed for a while. R.C. observed that Garcia was drinking "more beer after beer," he was "acting like a monster by being rude, mean, [and] grumpy," and he began getting violent. R.C. further testified that Garcia threatened to kill N.P. and R.C., he was doing stabbing motions with a screwdriver, and eventually, he slapped and hit N.P.

Later, after R.C. left and all the children had fallen asleep, Garcia made N.P. sit with him on one of the living room couches, and he directed her to take her clothes off.

Garcia threw her on the couch, lifted her legs up, and kept trying to stick his penis in her "butt." He said, "That's the only place where you're a virgin at. You're going to give me your ass." He also made comments like, "You know you like it, bitch. Let me get this." N.P. cried, kept yelling "stop" and "get off me," and tried to push him off, but Garcia responded by slapping N.P. in the face, punching her in the arm, and choking her. Garcia managed to get his penis in her bottom, he put his penis in her vagina, and he forced her to suck his penis. N.P. testified that consensual "anal sex" was "never" something that she and Garcia did as part of their relationship. She did not fight him off during vaginal sex only because she thought Garcia might leave her alone. He did not leave her alone, but forced her to perform oral sex. Afterwards, Garcia made N.P. sit on the floor, in a corner, naked. She sat like that for over an hour, cold, and begging him to be allowed to go to bed, while he dozed on the couch. By 4:30 a.m., he said, "Bitch, go to sleep," and she went in the bedroom to lay down.

Several hours later, after feeding the kids breakfast, Garcia ordered N.P. to "get the fuck in the room," and said he was going to "put it to [her] butt again." He told her to remain standing and hold the bed, and he tried to stick his penis in her anus. N.P. started crying and said "no"; Garcia put his penis in her vagina instead. According to N.P., she stopped "fighting" and actively resisting him because she did not want to be hit or suffer a "worse" fate. N.P. eventually went into the bathroom where she cried, prayed, and took a shower. In N.P.'s mind, Garcia had gone "too far" with anal sex, and she was going to leave him. She left the house with Carlos as soon as she could, without any of her

6

personal belongings or any specific escape plan. All she thought of that morning was "to run away and never return."

On a street corner by a local taco shop, Crystal and Crystal's mother, Mary La Faye, happened to spot N.P. Crystal testified that she had never seen N.P. in the state she was in that morning. N.P. was hysterically crying and shaking, and looked like she was on the verge of collapsing or like "something bad had happened to her." N.P. told Crystal and Mary about being beaten, raped, sodomized, and forced to perform oral sex on Garcia. Mary noticed red marks on N.P.'s neck, either from Garcia choking her or "shoving her into his parts." Crystal and Mary helped N.P. get to a shelter for abused women. The shelter's social worker as well as a responding police officer confirmed the report made by N.P., her appearance and demeanor at the time of making the report, and her expressed fear of coming in contact with Garcia. Furthermore, the officer personally observed and took photographs of injuries and bruises on N.P.'s body, including her arms and legs. These photographs were admitted into evidence. N.P. later gave the same general account of events to a sexual assault nurse examiner, a different social worker, and a police detective. The detective testified that he believed the incident reported by N.P. was "life changing for her."

N.P. voluntarily submitted to a sexual assault examination. The findings of the exam were consistent with the history provided by N.P. In addition, sperm collected from N.P.'s cervix and rectum matched Garcia's DNA. Finally, a clinical psychologist, David Wexler, testified generally about domestic violence and common reasons why someone will stay with an abuser even though the person is being abused. Dr. Wexler

had reviewed N.P.'s case file, and in his opinion, her behavior was consistent with that of a domestic violence victim.

Garcia decided to testify at trial in his own defense. He mostly admitted to physically abusing N.P., Abraham, and his children. Though he tended to minimize the instances, Garcia admitted punching, slapping, and kicking N.P., as well as using his dog stick to hit her. Garcia also testified that he had repeatedly lied to child welfare authorities and to officers who arrested him in November 2013.

Regarding the charged crimes on November 11, 2013, Garcia testified that he had punched and kicked N.P. in the early evening because he was frustrated with her silent treatment that day. He said that N.P. cried and tried to defend herself, but he hit her again. Eventually, according to Garcia, a few hours went by and they essentially made up. They then proceeded to have consensual sex "all night," or for about four hours. Garcia testified that N.P. agreed to all of their sexual activities. He acknowledged they had never before had anal sex during their relationship. When he suggested it, "she said if it started to hurt she was going to tell me and I was supposed to get off." When she got a cramp in her leg, N.P. told him to "get off," which he did about a minute or two later. Garcia said that N.P. was not crying before, during, or after they had sex, and he denied making her sit naked in a corner. Likewise, Garcia testified that they had consensual sex again in the morning. He said that it was not uncommon for him and N.P. to fight, make up, and have sex. When questioned why he had not originally mentioned the occurrence of anal sex to police officers even though he had told them about other sex acts, Garcia's explanation was that "it was none of [the officers'] business." He could not explain why,

8

after seven years of dating, he had thought of asking N.P. to have anal sex with him for the first time on November 11.

DISCUSSION

I. *Evidence of Prior Acts of Domestic Violence*

A. *Additional Background*

At the start of trial, the People filed motions in limine to admit certain evidence, including: (1) the testimony of N.P.'s close friends, whom N.P. had made out-of-court statements to about the charged acts and/or past abuse by Garcia, under Evidence Code sections 1240 and 1236;[1] and (2) Garcia's prior acts of domestic violence under sections 1109 and 352. The prior acts include the September 2008 bloody nose incident, recurring beatings and threats against N.P. during their relationship, and the October 2010 physical abuse of Abraham discovered by the school nurse.

Garcia filed motions in limine to exclude evidence of prior bad acts, child abuse, and disclosures of alleged abuse. The court ruled that the prior acts involving domestic violence, child abuse, and disclosures, were admissible. The court engaged in a lengthy analysis of whether each incident and/or proposed testimony was "domestic violence" as contemplated under section 1109, and furthermore, whether the evidence would be admitted under section 352. The court understood that the jurors would be considering the acts as propensity evidence, and it discussed why each incident or testimony concerning recurring violence would not be unduly prejudicial, confusing, or result in an

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

9

undue consumption of time.  In response to defense counsel's particular objection concerning the instance of child abuse against Abraham, the court reasoned that the incident of stomach punching was no more "inflammatory" than the charged acts.

B.  *Analysis*

Garcia challenges the trial court's admission of evidence regarding prior acts of domestic violence against N.P. and Abraham.  He argues that portions of witnesses' testimony were overly general, limited in probative value, repetitive, and inflammatory, and the trial court did not properly conduct a weighing test under Evidence Code section 352.

Section 1109 provides in part:  "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  Under these statutes, evidence of past domestic violence is admissible as propensity evidence unless the court determines that its probative value is "substantially outweighed" by its prejudicial impact.  (§ 352; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704 (*Cabrera*).)  We review a challenge to a trial court's decision to admit such evidence for abuse of discretion.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

The Legislature has found that in domestic violence cases, evidence of prior acts is highly probative in demonstrating the propensity of the defendant.  (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.)  " 'The propensity inference is particularly appropriate in the area of domestic violence because on[]going violence and abuse is the

10

norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.' . . . ." (*Ibid.*, quoting Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, pp. 3-4.)

Admission of propensity evidence is not fundamentally unfair in domestic violence cases so long as the trial court balances its probative value against the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (E.g., *Cabrera*, *supra*, 152 Cal.App.4th at p. 704 [citing other California Court of Appeal decisions].)

The trial court did not abuse its discretion in admitting evidence of past domestic violence against N.P. and Abraham. The prior acts against N.P. were similar to and led up to the charged acts, and the totality of Garcia's violent threats and behavior tended to show his dominance and control over her, as well as the escalating nature of his crimes against her. Without the testimony of various observers—each of whom was only aware of certain incidents—we doubt the Legislature's purpose of enacting section 1109 would have been fulfilled in this case. In that regard, the probative value of N.P.'s friends' and children's testimony is principally in its cumulative nature. Moreover, the prior acts, including those perpetrated against N.P.'s children, tended to show the jury that N.P. had a rational basis to fear Garcia and that she was living in a constant state of terror, which is the main reason why she had not been able to leave him in the past. He had harmed her

11

and her children to varying degrees, but he was always threatening to do "worse." The trial court limited Abraham's detailed testimony to a single 2010 incident of being punched in the stomach, which he personally experienced, and found that the act was not as serious as the charged acts. The admitted evidence was highly relevant and probative of the issues in this case.

Garcia argues that the evidence should have been excluded because none of the past acts involved sexual acts, he effectively admitted the charges of corporal injury, and the evidence was not probative to rape and sodomy. These arguments are misplaced. Garcia pled not guilty to the corporal injury charges, requiring the People to prove each element of those crimes. The record supports that Garcia consistently lied about, denied, or minimized, any physical abuse of N.P. Without the testimony of various witnesses, it is not likely that Garcia would have made any admissions regarding physical abuse. In addition, the prior acts evidence allowed the jury to see that Garcia's conduct had reached a new (and higher) level of violence when he sodomized N.P., lending credibility to her testimony that he had gone "too far." Based on our review of the record, the testimony did not consume an undue amount of time, and the prosecutor clearly signaled when her questions related to specific events of November 2013. We agree with the trial court that none of the prior incidents was more inflammatory than the charged acts, nor would the jury improperly convict Garcia on the basis of those past acts alone.

The trial court's admission of prior acts evidence was not an abuse of discretion and did not result in a fundamentally unfair trial.

12

## II. *Jury Instruction on Mistake of Fact Regarding Consent*

### A. *Additional Background*

The trial court provided the jury with CALCRIM No. 1000 on the elements of rape, including the meaning of consent, but did not instruct on a reasonable belief of consent defense. Thus, the following bracketed language of CALCRIM No. 1000 was omitted: "[The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse [and actually and reasonably believed that she consented throughout the act of intercourse]. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty.]"

During deliberations, a juror (juror 7) sent out a note, stating in part: "By law, is consent under duress, "consent," as identified in criteria # 3." "Criteria # 3" referred to the People's requirement to prove that "[t]he woman did not consent to the intercourse." Defense counsel renewed her request for an instruction on mistake of fact regarding consent.

After hearing the arguments of counsel, the trial court denied Garcia's request. The court discussed that there was no substantial evidence of "equivocal conduct" that would have led Garcia to reasonably and in good faith believe that consent existed where it did not. The court discussed how, according to Garcia, he and N.P. had consensual "make-up sex"—not that she was consenting out of fear or being beaten. In addition, the court indicated that the reasonable belief of consent instruction is not required when a

13

defendant's belief is not objectively reasonable.  Accordingly, the court responded to the juror's question by referring the jury back to CALCRIM No. 1000, which states, "To consent, a woman must act freely and voluntarily and know the nature of the act."  The court also noted that "Duress" is defined separately in CALCRIM No. 1000, and relates to the manner in which the defendant accomplishes the act of sexual intercourse.

B.  *Analysis*

Garcia contends that the trial court erred by not instructing the jury on the defense of mistake of fact regarding consent.  He argues there is sufficient evidence to support his mistaken belief that N.P. consented to vaginal sex.  He points to the jury's note as indicia that it was struggling on the issue of N.P.'s consent or lack thereof.

The trial court has a duty to instruct on the reasonable mistake defense only if there is "substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not."  (*People v. Williams* (1992) 4 Cal.4th 354, 362 (*Williams*); *People v. Mayberry* (1975) 15 Cal.3d 143, 153-158 (*Mayberry*).)  The so-called *Mayberry* defense has "two components, one subjective, and one objective.  The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.  In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent."  (*Williams*, at pp. 360-361.)

"In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the

14

circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams*, *supra*, 4 Cal.4th at p. 361.)

We conclude that Garcia failed to satisfy both the subjective and objective components of a *Mayberry* defense to rape, and the court correctly declined to give such an instruction. The record does not contain substantial evidence of equivocal conduct by N.P. from which Garcia could have mistakenly believed she consented to vaginal sex. If N.P.'s account of events is believed, then she did not consent to any sexual activities that night. Moreover, even if Garcia believed she consented to sexual intercourse despite her yelling, crying, and resistance, then his mistaken belief was not "formed under circumstances society will tolerate as reasonable." (*Williams*, *supra*, 4 Cal.4th at p. 361.) Finally, if Garcia's testimony is believed, then he and N.P. had consensual sex. The court did not err in refusing to instruct the jury on mistake of fact regarding consent.

With respect to the jury's question regarding "consent under duress," the jury apparently conflated the element of lack of "consent" with the separate element of whether a defendant accomplishes the act of sexual intercourse through "force, violence, *duress*, menace or fear . . . ." (CALCRIM No. 1000, emphasis added.) The court did not err by referring the jury back to the instruction that separately delineates the elements and defines those terms.

15

### III. *Defense Counsel's Request for Juror Contact Information*

#### A. *Additional Background*

After the verdicts were read, Garcia filed a motion for an order disclosing jurors' contact information, and attached his counsel's declaration. He argued that he needed juror information to prepare a motion for new trial. Juror 7 said that several jurors had reported struggling with the issue of "consent" if Garcia's testimony regarding anal sex was believed, and in addition, juror 7 "felt 'bullied' " by the other jurors during deliberations. Garcia's counsel learned this information through postverdict interviews of several jurors.

The People opposed Garcia's motion, attaching a declaration of the deputy district attorney (D.A.) who interviewed the same jurors. The interviews occurred in a hallway outside the courtroom, where three jurors stayed behind to discuss the case in a group setting. The D.A.'s declaration indicates that juror 7 explained that it had been more difficult for her to reach a guilty verdict on the rape count against Garcia, and that there was some harassment and bullying by other jurors during deliberations. However, juror 7 reached a guilty verdict based on the evidence. Another juror told the interviewing attorneys about additional pieces of evidence that she believed would have helped the prosecution's case (e.g., pictures of the inside of N.P.'s home or corroborating text messages). Another juror was present but did not say much.

The trial court denied Garcia's motion, finding that he had not made a prima facie showing of "good cause" to warrant disclosure of the jurors' otherwise sealed contact information. Specifically, the court discussed that the jury's deliberative processes could

16

not be used to challenge its verdict, and there was not a sufficient showing that prejudicial misconduct occurred in the form of "overt acts, conditions, [and] events[.]"

B. *Analysis*

Garcia contends that the trial court erred by denying his motion for jurors' contact information so that he could gather evidence for a motion for new trial on grounds of instructional error and juror coercion. Garcia argues that the jury's struggle with consent shows he should have received the mistake of fact regarding consent defense and that juror 7's statements supported the existence of juror misconduct.

A defendant must establish "good cause" to support a petition for jurors' contact information. (Code Civ. Proc., § 237, subd. (b); *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990 (*Carrasco*).) Under relevant case law, a defendant must make " 'a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.' " (*Carrasco*, at p. 990, quoting *People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.) We review a trial court's decision to deny a defendant's request for disclosure of jurors' contact information under the deferential abuse of discretion standard. (*Carrasco*, at p. 991.)

The trial court did not abuse its discretion in finding that Garcia failed to make the requisite showing to obtain jurors' contact information. As we discussed, *ante*, the trial court properly declined to give a *Mayberry* instruction. No further information from jurors is needed on that point. With respect to juror 7's comment that she felt bullied

17

during deliberations, we agree with the trial court's assessment that her comments were insufficient to support a reasonable belief that jury misconduct occurred. Juror 7 did not mention that anyone specifically threatened her if she would not vote a certain way, and she was standing next to two other jurors who could have, but did not, speak up about any overt acts or coercive statements that could have improperly influenced the verdict. (See *In re Stankewitz* (1985) 40 Cal.3d 391, 398.) Indeed, juror 7 affirmed that her decision to render a guilty verdict was based on the evidence. The trial judge observed that juror 7 was "weepy" and emotional over the verdicts, and construed her comments to relate to her mental processes, which would not be admissible evidence to support a motion for new trial. (§ 1150, subd. (a); see *People v. Burgener* (2003) 29 Cal.4th 833, 879 [juror's perception of court's comments as "threat" would be inadmissible evidence of her state of mind, and the court's remarks, viewed as a whole, were not coercive].) Garcia did not set forth sufficient facts to support a reasonable belief that jury misconduct occurred.

The trial court did not abuse its discretion in denying Garcia's request for jurors' contact information. Because we conclude that the trial court did not err on any grounds asserted by Garcia, we need not address his contention regarding cumulative errors.

18

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:


HUFFMAN, Acting P.J.


HALLER, J.