Filed 2/11/15  P. v. Garcia CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOVAN A. GARCIA,<br><br>    Defendant and Appellant. | D064313<br><br><br>(Super. Ct. No. SCD233007) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Jovan A. Garcia guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and made a true finding on a firearm enhancement (§ 12022.53 subd. (d)). The trial court sentenced Garcia to a prison term of 50 years to life.

Garcia contends (1) the trial court erred in denying his posttrial petition for the release of juror information; (2) the trial court erred because it did not sua sponte give a clarifying instruction regarding the role of provocation in deciding whether a murder is first degree rather than second degree; and (3) defense counsel was ineffective for not requesting a clarifying instruction on provocation. We conclude that Garcia's arguments are without merit, and accordingly we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Shortly before noon on March 13, 2011, Garcia killed Jesus Hernandez on the street in front of Hernandez's house by shooting Hernandez five times while Hernandez drove by on a small motorcycle. Two witnesses — Garcia's brother-in-law and a neighbor — saw the shooting take place. Three days later, Garcia was identified as a suspect and questioned by police. During the interview Garcia admitted to the shooting. Garcia was charged with murder (§ 187, subd. (a)), with the further allegation that he personally used a firearm causing death or great bodily injury.

At trial, Hernandez's brother-in-law, Javier Garcia (Javier),[2] testified that he was standing in front of the family home watching Hernandez drive up and down the street on

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

a small motorcycle. Javier noticed Garcia walking down the sidewalk on the opposite side of the street toward him and Hernandez. As Hernandez drove toward Garcia on the motorcycle, Garcia crossed into the middle of the street and opened fire on Hernandez from about three to four feet away, shooting five bullets into Hernandez's shoulder, chest and thigh. Hernandez and the motorcycle fell to the ground. Garcia ran away and was picked up by someone in a brown station wagon.

The shooting was also witnessed by a neighbor, Delfino Flores. While walking down the sidewalk to another neighbor's house, Flores crossed paths with Garcia just prior to the shooting. Garcia had been dropped off near the corner by a brown station wagon, and Flores described Garcia as looking troubled and lost.

Flores was speaking with his neighbor and had his back turned when the shooting started, but he turned around when he heard gunshots. He saw Garcia pointing a gun at Hernandez and saw Hernandez on the ground. After going into the backyard of his neighbor's house to look for something to use as a weapon, Flores came back out to the front of the house and saw Garcia get picked up by the vehicle that had dropped him off minutes earlier.

Flores did not hear Garcia say anything during the shooting. Javier, in contrast, heard Garcia say something including the word "National." Although he could not remember the exact words at trial, Javier told the police immediately after the shooting that Garcia said "This is National Boys." There was evidence at trial that Garcia or his

---

2     Because the defendant and Javier share the same surname, we will refer to Javier by his first name, and we intend no disrespect by doing so.

3

family members were associated with a group called the National Boys[3] who were in a dispute with another local group called the Untouchables. Further, according to evidence at trial, members of the Untouchables lived on Hernandez's street.

Garcia's videotaped interview with the police was played for the jury. During the interview, Garcia explained why he committed the shooting.[4] According to Garcia, for a short time he had been "kick[ing] it" with the National Boys group. During that time, his girlfriend was beaten up while at the playground with their young son.[5] Garcia later found out that "it was the guys from UT" who beat up his girlfriend.[6] On the morning of the shooting, according to Garcia, he was on a work break in the parking lot of Home Depot when Hernandez drove up and tried to run over him with a blue truck. Garcia left work, obtained a gun, and had a friend drive him to Hernandez's street. As Garcia explained, he was walking down Hernandez's street when Hernandez came up to him "trying to scare me with his dogs" who were following the motorcycle.[7] Garcia

---

[3] The group was also referred to during trial as "National Block," "National Block Boys" or "National Block Soldiers."

[4] We quote from a transcript of the interview, which was an exhibit at trial.

[5] During the girlfriend's testimony, she explained that she had been beaten up in November 2010, several months before the March 2011 shooting.

[6] Although not explicitly explained at trial, from the context we infer that "UT" likely refers to the Untouchables.

[7] Witnesses testified that Hernandez owned one pit bull dog, but the testimony was conflicting as to whether the dog was with Hernandez at the time of the shooting.

4

explained, "And I was like, 'What's up?' It's like, 'What the fuck?' Then he was like, 'What's up then?' Like, I was like, 'You really want to beef with me? Like, what the fuck? Like, what's the deal?' And then he's like, 'Yeah,' and then that's when he was going to get off his bike and I don't know what he was going to do, I think he was going to come at me, so I just did it." According to Garcia, Hernandez was "laughing at" him.

During closing argument, defense counsel argued that instead of finding that Garcia committed murder, the jury should return a verdict of voluntary manslaughter based either on a theory of imperfect self-defense or on the theory that Garcia acted in the heat of passion, which arose when Hernandez laughed at him, adding to Garcia's preexisting anger toward Hernandez.

The jury found Garcia guilty of first degree murder and made a true finding on the firearm allegation. The trial court sentenced Garcia to prison for a term of 50 years to life.

## II

## DISCUSSION

A.    *The Trial Court Properly Denied the Petition for Release of Juror Information*

After trial, Garcia filed a petition for an order directing that the addresses and telephone numbers of the jurors be disclosed so that defense counsel could prepare a motion for a new trial based on jury misconduct. The trial court denied the petition on the ground that Garcia did not make a prima facie showing of good cause for the release of the information. Garcia challenges that decision on appeal.

5

1.  *Law Governing Release of Juror Information*

As applicable here, the law provides that after the recordation of a jury's verdict in a criminal jury proceeding, the court's record is sealed, with all personal juror identifying information of trial jurors removed from the court record. (Code Civ. Proc., § 237, subd. (a)(2)-(3).) Under Code of Civil Procedure section 206, subdivision (g), "a defendant or defendant's counsel may . . . petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."

Code of Civil Procedure section 237, subdivision (b) sets forth the standard by which a petition for release of juror information is evaluated. "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm." (*Ibid*.)[8]

---

[8] If the trial court decides that the petitioning party has shown good cause for the release of the information, a hearing is held after jurors are given notice of the proposed release of personal identifying information and an opportunity to protest. (Code Civ. Proc., § 237, subd. (c).)

A prima facie case of good cause is shown "if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.) To establish good cause "the defendant . . . has to prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493.) "This rule safeguards both juror privacy and the integrity of our jury process against unwarranted 'fishing expeditions' by parties hoping to uncover information to invalidate the jury's verdict." (*Rhodes*, at p. 552.)

If the trial court decides that the petitioning party has made a prima facie showing of good cause for the release of the personal juror identifying information, and there is no other compelling interest against disclosure, jurors are given notice of the proposed release of information and an opportunity to protest, and a hearing is held to determine whether to release the information. (Code Civ. Proc., § 237, subd. (c).)

A trial court's decision that a defendant has not made a prima facie showing of good cause is reviewed for abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

2. *The Trial Court Did Not Abuse Its Discretion in Deciding That Garcia's Petition Did Not Establish Good Cause*

Here, the trial court denied Garcia's petition for the release of personal juror identifying information on the ground that he did not make a prima facie showing of good cause because the facts set forth in defense counsel's declaration, even if true, would

7

not constitute juror misconduct. As we will explain, the trial court did not abuse its discretion in reaching that conclusion.

In support of his petition, Garcia submitted a declaration from defense counsel, which described statements made by Juror No. 41 in posttrial conversations with an investigator from the alternate public defender's office. Juror No. 19 was the foreperson, and according to Juror No. 41's statement to the investigator, three aspects Juror No. 19's conduct during deliberations made Juror No. 41 uncomfortable.

First, Juror No. 19 stated during deliberations that she thought a photograph of the scene of the shooting introduced at trial was misleading based on her personal knowledge of the length of the street and the distance between the houses. Specifically, Juror No. 19 explained that "she had worked in that area as a physical therapist and had to go to those homes," and based on that experience, "the houses . . . on that street were very close together and . . . the street was not nearly as long as it had appeared in the photo."[9]

Next, Juror No. 19, along with one of the male jurors, talked about their personal knowledge of guns. In particular, Juror No. 19 said that she personally shot weapons and that based on her personal knowledge, Garcia "couldn't have closed his eyes when he shot and . . . it was therefore very obvious to her that [Garcia] intended to kill the deceased."

---

[9] The length of the street was relevant to the issues at trial because defense counsel questioned during closing argument whether Javier, who was standing approximately four houses away from Hernandez during the shooting, was actually close enough to be able to hear Garcia say something like "This is National Boys."

8

Finally, Juror No. 19 "had a pro prosecution agenda"; "she spoke over other people who had different opinions"; and Juror No. 41 "finally caved in to the views of [Juror No. 19] after forceful argument," which Juror No. 41 believed "amounted to steamrolling."

a.    *The Juror Comments Did Not Improperly Inject Outside Information*

Garcia first argues that the information in defense counsel's declaration establishes juror misconduct because it shows that Juror No. 19 improperly injected outside information into the jury deliberations.  Specifically, Garcia argues that it was misconduct for Juror No. 19 to relate (1) her personal knowledge of the street on which the shooting occurred, and (2) her personal experience with shooting guns.  As we will explain, we disagree.

As our Supreme Court has explained, it is permissible for jurors to rely on their personal experiences in evaluating the evidence presented at trial.  "A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters. . . .  Nevertheless, jurors may rely on their own experiences in evaluating the testimony of the witnesses.  'Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself.  Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them.'  . . .  'Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.  That they do so is one of the strengths of the jury system.  It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the

9

evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated . . . . [Otherwise,] few verdicts would be proof against challenge.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1414, citations omitted (*Leonard*).)

" 'A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in *evaluating and interpreting* that evidence.' " (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 77 (*Allen and Johnson*).) "Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (1996) 12 Cal.4th 935, 963.)

Here, in commenting that the photographic exhibit of the street was not an accurate representation of the street's length, there is no suggestion that Juror No. 19 consulted any outside sources for any specialized information about the scene of the crime. Instead, Juror No. 19 properly relied on her personal familiarity with the street to evaluate the evidence presented at trial. Specifically, as Juror No. 19 had experience with the neighborhood, she was permitted to use her own preexisting personal knowledge to evaluate the photographic exhibit to determine whether the photograph was a credible

10

representation of the crime scene.  Indeed, it would have been impossible for Juror No. 19 to have divorced her evaluation of the photographic evidence from her personal knowledge of the physical layout of the neighborhood.  As our Supreme Court has explained, "a distinction must be drawn between the introduction of new facts and a juror's reliance on his or her life experience when *evaluating* evidence."  (*Allen and Johnson*, *supra*, 53 Cal.4th at p. 76 [juror permissibly discussed his own experience with timecards in the workplace to conclude that a witness was not telling the truth about a particular factual scenario involving timecards]; see also *In re Lucas* (2004) 33 Cal.4th 682, 696 [juror did not commit misconduct by relating his personal experiences with drug use as part of evaluating the evidence at trial].)  Here, Juror No. 19 did not commit misconduct in commenting on the length of the street because she simply evaluated the evidence based on her own life experiences rather than impermissibly introducing new facts into the jury deliberations.

It was also not misconduct for Juror No. 19, joined by one other juror, to comment about personal experiences with guns to evaluate whether Garcia was credible in claiming to have shot Hernandez with his eyes closed.  In a similar situation, our Supreme Court concluded that it was "a normal part of jury deliberations and . . . not misconduct" for a juror with personal experiences with firearms to form an opinion based on that experience.  (*Leonard*, *supra*, 40 Cal.4th at p. 1414.)  Specifically, the juror in *Leonard* properly evaluated the evidence based on his personal experience and did not impermissibly inject outside evidence when he "said he had experience firing handguns, and that the murder weapon was an 'up close and personal' gun that could be accurately

11

fired at close range without expertise." (*Id*. at pp. 1413-1414.) Just as in *Leonard*, the jurors in this case permissibly used their personal experience with guns, and related it during deliberations, to help form an opinion on the evidence presented at trial, rather than impermissibly introducing outside evidence.

b.  *Garcia Did Not Make a Prima Facie Showing of Juror Misconduct Based on Bias*

Garcia also contends that he made a prima facie showing requiring release of juror information because he showed that Juror No. 19 was impermissibly biased in favor of the prosecution. In support of this argument, Garcia points to the fact that, during voir dire, Juror No. 19 disclosed that she was married to a San Diego County deputy district attorney and that her brother-in-law held the same position in another county. Although, Juror No. 19 stated at that time that she would have no reservations returning a guilty verdict if warranted by the evidence, Garcia argues that she was nevertheless biased in favor of the prosecution based on her background. Garcia supports this contention solely by relying on Juror No. 41's claim that Juror No. 19 "had a pro prosecution agenda"; "she spoke over other people who had different opinions"; and that she engaged in "forceful argument" that "amounted to steamrolling."

It is well established that " '[f]or a juror to prejudge the case is serious misconduct.' " (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 792.) Thus, for example, juror misconduct may be established by a party establishing a juror made up his or her mind based on prejudice and bias before hearing all the evidence at trial. (*People v. Brown* (1976) 61 Cal.App.3d 476, 480.) "[W]here a verdict is attacked

12

for juror taint, the focus is on whether there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 294, italics omitted.)[10]

Here, although Garcia contends that Juror No. 19 prejudged the case based on pro-prosecution bias, the statements in defense counsel's declaration do not support such an inference. Juror No. 41 states that Juror No. 19 "had a pro prosecution agenda" during deliberations and engaged in "forceful argument." However, this establishes nothing more than that Juror No. 19 felt that the evidence supported the prosecution and argued forcefully to convince her fellow jurors of her views *after* hearing all of the evidence at trial. Garcia has presented no evidence of an "*overt* event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' " (*In re Hamilton*, *supra*, 20 Cal.4th at p. 294), that would suggest Juror No. 19 made up her mind about the case *before* hearing all of the evidence. Further, the forceful nature of Juror No. 19's statements in the jury room do not establish impermissible bias. " 'Jurors may be

_____

10    The focus on evidence of an overt act or circumstance to show improper bias is premised on Evidence Code section 1150, subdivision (a), which provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1281 [the limitation in Evid. Code, § 1150 "prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent"].)

13

expected to disagree during deliberations, even at times in heated fashion.'  Thus, '[t]o permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression.' "  (*People v. Keenan* (1988) 46 Cal.3d 478, 541.)  Juror No. 19's decision, after hearing the evidence, to advocate for a prosecution verdict is well within the normal scope of juror deliberations and does not suggest that Juror No. 19 prejudged the evidence.

In sum, the trial court was well within its discretion to conclude that Garcia did not make a prima facie showing of good cause to release personal juror identifying information because defense counsel's declaration did not set forth facts, which if further developed after contacting jurors, would support a claim of juror misconduct.

B.      *Garcia's Claim of Instructional Error Is Without Merit*

We next turn to Garcia's claim of instructional error.  One of Garcia's main defense theories was that he acted in the heat of passion, after being provoked by Hernandez, and was therefore guilty of voluntary manslaughter, not murder.  Related to the theory that Garcia was provoked by Hernandez, defense counsel requested that the trial court instruct the jury with CALCRIM No. 522, which explains that provocation may reduce a murder from first degree to second degree, as well as reduce a murder charge to manslaughter.  Although, as requested by Garcia, the trial court instructed the jury with CALCRIM No. 522, and Garcia did not request any clarifications to CALCRIM No. 522 in the trial court, Garcia contends on appeal that the trial court erred in not sua sponte adding clarifying language to CALCRIM No. 522.

14

Garcia does not explain exactly what language he contends the trial court should have added to CALCRIM No. 522, but he broadly describes the concept that he believes the trial court should have conveyed to the jury. Garcia explains that as stated in the instruction on voluntary manslaughter premised on a heat of passion theory (CALCRIM No. 570), provocation is sufficient to reduce murder to voluntary manslaughter only when the jury finds that a reasonable person standard is met. Specifically, the provocation must be of the type to "cause[] a person of average disposition to act rashly and without due deliberation" (CALCRIM No. 570). In contrast, when provocation is used to reduce first degree murder to second degree murder by negating the presence of premeditation and deliberation, the reasonable person standard does not apply. (See *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 ["If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder."].) Any provocation that serves to support a finding that the defendant acted without premeditation or deliberation is sufficient to reduce murder from first degree to second degree. (*Ibid.*) Garcia contends that the jury should have been instructed on this concept.

We reject Garcia's argument because he did not preserve it by making a request for the instructional clarification to CALCRIM No. 522 in the trial court. This case falls under the rule that "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) CALCRIM No. 522 accurately

15

states the law, and Garcia does not argue otherwise.[11]  Accordingly, "[i]f defendant believed the instruction . . . required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court." (*Lee*, at p. 638.)[12]  As Garcia did not request a clarification to CALCRIM No. 522 in the trial court, he may not argue on appeal that the trial court erred in not giving the clarifying instruction.

C.      *Garcia Has Not Established Ineffective Assistance of Counsel*

In a brief argument, Garcia contends that the trial court was ineffective for not requesting the clarification to CALCRIM No. 522 that we have discussed above.[13]

---

[11]     Although not challenging CALCRIM No. 522 as an accurate statement of the law, Garcia argues that the instructions as a whole were misleading and should have been clarified because the instruction on voluntary manslaughter based on heat of passion (CALCRIM No. 570), when read in combination with CALCRIM No. 522, gives the impression that provocation can reduce first degree murder to second degree murder only if the provocation satisfies a reasonable person standard.  We disagree.  CALCRIM No. 570 clearly states that it is describing the specific requirements for provocation to reduce murder to voluntary manslaughter, and nothing in the instruction suggests that it describes the requirements for reducing first degree murder to second degree.

[12]     In addition, it is well established that if CALCRIM No. 522 is not requested, a trial court has no sua sponte duty to give the instruction.  (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879.)  It logically follows that if the trial court has no sua sponte duty to give CALCRIM No. 522, it also has no sua sponte duty to instruct with *a clarifying modification* to CALCRIM No. 522 as Garcia contends is the case here.

[13]     We note that Garcia has improperly failed to include his ineffective assistance argument under a separate argument heading in his appellate brief.  Although we could decline to reach the merits of the argument on that basis, we will exercise our discretion to consider it.  (See Cal. Rules of Court, rule 8.204(a)(1) ["Each brief must:  [¶]  . . . [¶] (B) State each point under a separate heading or subheading summarizing the point, and support each point by argument . . . ."]; *Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 59 ["We may disregard arguments not properly presented under appropriate headings."].)

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *Ledesma*, at pp. 216, 218.) Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

Further, as is important here, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Garcia fails to establish that he received ineffective assistance, as defense counsel could have had a sound tactical basis for not asking the trial court to expand on CALCRIM No. 522. Specifically, it is reasonable for defense counsel to decline to

17

request an instruction that does not advance the defense's theory of the case. (*People v. Wader* (1993) 5 Cal.4th 610, 643 [defense counsel could have had a rational tactical purpose for not requesting an instruction that was inconsistent with the defense's theory of the case that the defendant did not intend to kill the victim].) Here, defense counsel's closing argument showed that she was focused on convincing the jury to rely on a heat of passion theory to reduce murder to *voluntary manslaughter*. Additional jury instructions on provocation as a basis for *second degree murder* as set forth in CALCRIM No. 522 would have been contrary to that strategy because the expanded instruction would have focused the jury on using the heat of passion theory to reach a verdict of second degree murder rather than to reach a verdict of voluntary manslaughter.

As we will reverse on the ground of ineffective assistance of counsel " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980), and defense counsel may have made a reasonable tactical decision to omit CALCRIM No. 522, we conclude that Garcia has failed to establish a ground for reversal.[14]

---

14      Because we have rejected each of Garcia's claims of error, we also reject Garcia's argument that any errors were cumulatively prejudicial.

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.